**1328**

NATIONAL ASSOCIATION OF
RECYCLING INDUSTRIES,
INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

Atchison, Topeka and Santa Fe Railway
Co., et al., Institute of Scrap Iron and
Steel, Inc., National Steel Corporation
(79–1582), American Paper Institute,
Inc. (79–1590), Intervenors.

INSTITUTE OF SCRAP IRON AND
STEEL, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

Atchison, Topeka and Santa Fe Railway
Co., et al., Intervenors.

ARMCO, INC., et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

Bethlehem Steel Corporation, Intervenor.

AMERICAN PAPER INSTITUTE,
INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

National Association of Recycling
Industries, Inc., Intervenors.

ATCHISON, TOPEKA AND SANTA FE
RAILWAY COMPANY, et al.,
Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

National Association of Recycling
Industries, Inc., Intervenors.

The ALUMINUM ASSOCIATION,
INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents,

National Association of Recycling
Industries, Inc., Intervenors.

FORT HOWARD PAPER COMPANY,
Petitioner,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

SOUTHERN PAPER TRAFFIC
CONFERENCE, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

SOUTHWESTERN PAPER TRAFFIC
CONFERENCE, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

WISCONSIN PAPER AND PULP
MANUFACTURERS TRAFFIC
ASSOCIATION, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

WESTERN PAPER TRAFFIC
CONFERENCE, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

GLASS PACKAGING INSTITUTE,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

Nos. 79–1393, 79–1395, 79–1582, 79–1583,
79–1590, 79–1611, 79–1620, 79–1838, 79–
1839, 79–1860, 79–1970 and 79–1984.

United States Court of Appeals,
District of Columbia Circuit.

Argued 17 Dec. 1979.

Decided 25 April 1980.

Rehearing Denied Aug. 15, 1980.

See also, D.C.Cir., 585 F.2d 522.

**1330**

Edward L. Merrigan, Washington, D.C., for petitioner National Ass'n of Recycling Industries, in No. 79–1393.

David Reichert, Cincinnati, Ohio, with whom Howard Gould and Stephen D. Strauss, Cincinnati, Ohio, were on the brief, for petitioner Institute of Scrap Iron and Steel, Inc., in No. 79–1395.

John F. Donelan, Washington, D.C., with whom John K. Maser, III, Eugene T. Liipfert, Fritz R. Kahn and L. John Osborn, Washington, D.C., Paul V. Miller, Bethlehem, Pa., were on the joint opening brief for Armco, Inc., Inland Steel Co., Republic Steel Corp., and Youngstown Sheet and Tube Co. (petitioners in No. 79–1582), and Bethlehem Steel Corp. and National Steel Corp. (intervenors in No. 79–1582).

John F. Donelan, Washington, D.C., with whom John K. Maser, III, and Renee D. Rysdahl, Washington, D.C., were on the brief, for petitioner American Paper Institute, Inc., in No. 79–1583.

Michael Boudin, Washington, D.C., with whom Timothy A. Harr, Washington, D.C., Richard W. Kienle, Roanoke, Va., and John A. Daily, Philadelphia, Pa., were on the brief, for petitioner Railroads in No. 79–1590.

Dickson R. Loos, Washington, D.C., for petitioner Aluminum Association, Inc., in No. 79–1611.

C. Michael Loftus, Washington, D.C., with whom William L. Slover and Donald G. Avery, Washington, D.C., were on the brief, for petitioner Fort Howard Paper Co. in No. 79–1620.

Robert N. Kharasch, Washington, D.C., with whom Edward D. Greenberg, Chicago,

Ill., was on the brief, for petitioner Southern Paper Traffic Conference in No. 79–1838, petitioner Southwestern Paper Traffic Conference in No. 79–1839, petitioner Wisconsin Paper and Pulp Manufacturers Traffic Ass'n, in No. 79–1860, and petitioner Western Paper Traffic Conference in No. 79–1970.

Michael M. Briley, Toledo, Ohio, with whom Louis E. Tosi and Stephen B. Mosier, Toledo, Ohio, were on the brief, for petitioner Glass Packaging Institute in No. 79–1984.

David Popowski, Washington, D.C., Atty., I. C. C., with whom Robert S. Burk, Acting Gen. Counsel, Washington, D.C., was on the brief, for respondent I. C. C.

Barry Grossman, Atty., Dept. of Justice, Washington, D.C., with whom Robert Lewis Thompson, Atty., Dept. of Justice, Washington, D.C., was on the brief for respondent Department of Justice.

Before WILKEY and MIKVA, Circuit Judges, and FLANNERY,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

These consolidated cases mark the second time this court has been called upon to review a final report and order of the Interstate Commerce Commission (ICC) in its congressionally mandated investigation of the railroad rate structure for recyclable commodities in relation to virgin or raw materials. In our review of the first Commission report and order in this proceeding, *National Association of Recycling Industries, Inc. v. Interstate Commerce Commission* (hereafter *NARI I*),[1] we vacated the order and remanded for expedited proceedings. The Commission has now completed its renewed investigation into recyclable rates, and its new decision has come under multiple challenge from petitioners of varying interests: railroads, shippers and users of recyclable commodities, and shippers and users of virgin materials. For reasons elaborated below we uphold the Commission's finding of competition between various recyclable and virgin commodities and its finding of discrimination in some railroad rates for recyclables; but we find certain aspects of the Commission's remedy, including its standard for reasonableness and its remedy for discrimination, to be beyond its authority or without support in the record. We accordingly vacate and remand on these specific issues.

### I.

The Commission's investigation into recyclable rates had its origin in section 204 of the Railroad Revitalization and Regulatory Reform Act of 1976.[2] That statutory provision required the ICC to conduct an investigation within a one-year period to determine whether the rate structure for rail transportation of recyclable and competing virgin natural resource materials was unjustly discriminatory or unreasonable, and to remove any such defects from the rate structure. The Commission commenced its investigation in February 1976, and upon its completion issued an order in February 1977 finding no discrimination in the rate structure and finding unreasonably high rates for a small number of recyclable products; the proceeding was designated *Ex Parte No. 319, Investigation of Freight Rates for the Transportation of Recyclable or Recycled Materials* and resulted in a decision on 16 April 1979.[3]

It was this order that we reviewed in our earlier *NARI I* decision. Our opinion in that case dealt in considerable detail with the various congressional actions leading up to the enactment of section 204, and presented a thorough account of Commission actions pursuant to that provision.[4] We will not repeat this account of factual

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 585 F.2d 522 (D.C. Cir.1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979).

2. Pub.L.No.94–210, 90 Stat. 40 (1976) (codified at 45 U.S.C. § 793 (1976)).

3. 356 I.C.C. 114 (1977).

4. *See NARI I,* 585 F.2d at 525–30.

and procedural background except as specifically relevant to the case now before us.

In its *Ex Parte No. 319* decision the Commission had arrived at a finding of no discrimination for each group of recyclable and virgin commodities by concluding either that the commodities did not compete with each other or that shippers were not competitively injured by rate disparities, since an allegedly low elasticity of demand for recyclables minimized the effect of rate increases.[5] Our decision held that the Commission had applied too narrow a definition of competition, inconsistent with the congressional mandate of section 204, by not looking at the potential for competition between recyclable and virgin commodities.[6] The result of the ICC's approach in its initial investigation was to uphold the existing rate structure without requiring any justification of rate disparities in terms of differing costs and other transportation characteristics. Section 204 had specified that the burden of proof to justify the existing rate structure should be upon the railroads; the Commission's initial order, we concluded in *NARI I*, had erred in shifting this statutory burden of proof.[7] The *NARI I* court remanded for a new investigation, and by separate order on 16 October 1978 imposed a six-month time limit on the Commission's issuance of a new order in the proceeding.

The Commission reopened the proceeding, designating it *Ex Parte No. 319 (Sub-No. 1), Further Investigation of Freight Rates for the Transportation of Recyclables or Recycled Materials.*[8] It was not until 18 December 1978, however, that the Commission reopened the record for parties to submit new evidence in *Ex Parte No. 319 (Sub-No. 1)*. In orders reopening the proceeding, the Commission requested new cost data from the railroads. But with less than seven weeks to submit new evidence, the railroads contributed little new data. Finding the new data inadequate, the Commission chose to rely instead on the old data from its original *Ex Parte No. 319* investigation, and to update that data to provide estimates of current revenue-cost ratios. Revenues were accordingly revised to the level of the *Ex Parte No. 357* general rate proceeding of December 1978, and costs were brought to the October 1978 level.[9]

The revenue-variable cost ratios used by the Commission do not pertain to specific rates for individual shipments of commodities. Rather they are weighted averages for each commodity by region. The averages for revenue and cost are weighted according to annual tonnage for each commodity in 1975. Estimates of average revenues for commodities are not entirely accurate due to the Commission's reliance on general rate proceeding increases without full allowance for various hold-downs and flag-outs in the proceedings.[10]

One piece of new evidence utilized in the *Ex Parte No. 319 (Sub-No. 1)* proceeding was a survey of shippers and receivers of recyclables, conducted and submitted by Southern Railways. Such a survey was suggested in our *NARI I* decision.[11] The Commission concluded, based on survey responses, that rail freight rates do have an effect on the movement of recyclables.[12]

The Commission stated that it would apply traditional standards for determining whether there was discrimination between rates. In the same manner as in its first decision, it listed four steps for determining whether there was unjust discrimination. First, it inquired whether a disparity exists between revenue-cost ratios for each group of recyclables and virgin commodities. Second, if there is, does the recyclable commodity compete with the virgin commodity? Third, if there is competition, are shippers of the recyclable product being injured by

---

5. *See id.* at 530.

6. *See id.* at 540.

7. *See id.*

8. 361 I.C.C. 238 (1979).

9. *See id.* at 238–40, *reprinted in* Joint Appendix (J.A.) at 3452–54.

10. *See* 361 I.C.C. at 239–40.

11. *See NARI I*, 585 F.2d at 540 n.87.

12. *See* 361 I.C.C. at 241–42.

the disparity in rates? Finally, do differences in transportation characteristics justify any injurious disparity between competing commodities?[13]

In investigating the second step of this procedure, the ICC considered the potential for competition between recyclable and virgin products, and found recyclable and virgin materials generally to be competitive within commodity groups; this contrasted with its initial *Ex Parte No. 319* decision. In step three the Commission logically inferred injury, rather than requiring direct proof of actual injury. This allowed the Commission to determine competitive injury directly from the fact of competition among commodities and disparity of ratios between them, with the result that the third step was automatically satisfied for any situation of differing ratios between competing recyclables and virgin commodities under steps one and two.[14]

Further, in accordance with section 204, the ICC had a duty to decide if rates for recyclable product shipping were reasonable. Although the Commission traditionally looks at many factors to determine reasonableness, it simplified its reasonableness analysis in this investigation by applying a mathematical standard as an upper bound on revenue-variable cost ratios. The Commission chose as its standard for maximum reasonable revenue-variable cost ratio the figure of 180 percent. The regional rate structure for any recyclable commodity was thus deemed unreasonable if it produced revenue eighty percent greater than variable cost. The Commission justified its choice of this figure by stating that in recent general rate cases it has not investigated rate increases that resulted in revenue-cost ratios of less than 180 percent. The Commission emphasized that the 180 percent standard applied only to this proceeding and was developed for these unique circumstances.[15]

For these recyclable commodities with regional weighted revenue-cost ratios in excess of the reasonableness standard, the ICC required the railroads to lower their rates so as to produce ratios below 180. Where the Commission found unjust discrimination, it directed the railroads to equalize the revenue-cost ratios of the competing recyclable and virgin commodities at any reasonable level; *i.e.*, they could be equalized at any rate less than 180 percent. This remedy allowed actual increases in recyclable shipping rates where there had before been unjust discrimination; railroads could remedy discrimination by raising rates for both a recyclable product and a competing virgin commodity until equal revenue-cost ratios were achieved at some level below 180 percent.

The Commission made two subsequent amendments to its decision. On 26 July 1979, following approval from this court for an extension of time for the proceeding, the Commission decided certain questions raised by petitions for clarification of the 16 April 1979 decision. These petitions urged the ICC to readjust its costing methodology in response to alleged errors and new evidence presented in the petitions, and also to adjust some of the rates used in calculating the ratios in order to reflect actual changes in those rates. The ICC accepted some of the proposed adjustments, based on its authority to consider new evidence or changed circumstances that would materially affect a prior decision.[16] The Commission also corrected some alleged typographical errors in the revenue-to-variable cost ratios, which had some effect on the extent of remedy required.[17] In response to a petition requesting the Commission to prohibit rate increases for recyclables toward the 180 percent maximum reasonableness standard, the Commission held that such increases were acceptable so long as the resulting revenue-cost ratios were within the stan-

13. *See id.* at 242.

14. *See id.* at 242–43.

15. *See id.* at 243–48.

16. *See Ex Parte No. 319, Investigation of Freight Rates for the Transportation of Recyclables or Recycled Commodities,* 361 I.C.C. 641, 642–45 (1979).

17. *See id.* at 647.

dard. The Commission did urge the railroads not to raise recyclable rates, but affirmed that railroads have the authority to do so up to a ratio of 180 percent.[18]

A further ICC decision on 14 September 1979 corrected several alleged errors pointed out in a petition of the Southwestern Paper Traffic Conference. These corrections had the effect of raising the revenue-cost ratio for virgin commodities used to make paper, from 143 to 155 percent. This ratio was still discriminatory against a ratio of 157 for recyclable waste paper, though the degree of discrimination was less following this clerical adjustment.[19]

## II.

■ In reviewing the Commission's decision, we pose the usual inquiries as to the action of the Agency: First, did the Agency act within its statutory authority? Second, was there procedural due process, i. e., notice, followed by appropriate opportunity either to comment or to participate in a hearing? Third, is there evidence (substantial evidence in the case of adjudication) to support the Agency's action? Fourth, is the rationale of the Agency both discernible and defensible? If the answer to any of these is in the negative, then the Agency action must be vacated as either beyond its authority or arbitrary and capricious under Title 5, sections 553 and 706.[20] Since our earlier opinion in *NARI I* controls the Commission's proceedings on remand, we must also inquire whether the ICC decision is in accordance with the law of that case.

## A.

■ We review first the Commission's analysis of the discrimination issue. The Commission's four steps of analysis, it asserts, are those traditionally used in discrimination inquiries. Concerning the initial step of identifying disparities, however, the ICC has in the past looked for disparities in actual rates rather than in revenue-cost ratios. We must decide at the outset whether the use of ratios is reasonable in this context.

Our earlier *NARI I* decision spoke of the elimination of "disparate rate structures" and "disparate rates," where not justified by differing transportation characteristics of the commodities in question.[21] Among the transportation characteristics to be considered are variable costs. By focusing on ratios of revenue to variable cost, and identifying those ratios for recyclable products that exceed the ratios for competing virgin materials, the Commission has in effect narrowed its scrutiny to those rate disparities that are not justified by proportionate differences in variable costs. Where rate disparities are matched by proportionate differences in variable costs, there is no unjust rate discrimination. To focus on revenue-variable cost ratios is a reasonable means to identify all rate disparities which are not justified by the transportation characteristic of variable cost. This is logical compliance with the mandate of section 204 and our *NARI I* decision since those rate disparities which are in fact justified by cost differences need not be eliminated. In choosing to focus on territorial weighted averages rather than individual rates, the Commission has acted rationally to make its task manageable in this complex proceeding.

## B.

In the next step of its discrimination analysis, the Commission found competition between recyclable and virgin commodities in almost all categories for which it investigated the rate structure. The railroads, along with other petitioners, contend that the Commission failed to follow traditional and proper standards for determining whether products compete. In its first decision, vacated in *NARI I*, the Commission required a showing that two products were

---

18. *See id.* at 649–50.

19. *Ex Parte No. 319, Ex Parte No. 319 (Sub-No. 1), Investigation of Freight Rates*, slip op. at 6–7 (14 Sept. 1979), *reprinted in* J.A. at 4203–04.

20. *See* 5 U.S.C. §§ 553, 706 (1976).

21. *NARI I*, 585 F.2d at 533.

substitutable before they could be found competitive. In its April 1979 decision it broadened the standard in response to our *NARI I* opinion, to include potential competitive relationships between recyclable and virgin materials.[22]

The term "competition" in this context does not lend itself to precise definitions and standards. Whether a reduction in shipping rates of recyclables will tend to encourage greater use of recyclables at the expense of virgin materials depends largely on the time frame in question. In the short run, existing production processes may well require fixed, unalterable proportions of scrap and raw materials. This factor leads logically to an inference of no competition in the short run between the two types of materials, as the Commission concluded in its initial decision, since changes in relative shipping rates cannot quickly induce changes in the amount of scrap or raw materials going into production. But in the long run, relative shipping rates are one factor that will influence, to some degree, industrial choices to build new plants with production processes that use either higher or lower proportions of scrap versus raw materials. This factor leads logically to a finding of competition when one focuses on the long run.

There is usually no legal principle, however, for choosing between a long-run and a short-run focus. When the recyclable and virgin materials are used to make the same end product, we cannot say that it is unreasonable for the Commission to take into account the long-term potential for competition and to conclude that the products compete. In those commodity categories where the Commission found that recyclable and virgin materials can be used to a significant extent to manufacture the same end product, it was reasonable for the Commission to conclude that they compete.[23]

Given the congressional intent to encourage the use of recyclables, as manifested in section 204, contemplating a broad definition of competition, the Commission properly changed the short-run focus of its initial decision to a long-range analysis. For the same reason our *NARI I* opinion specifically reversed the Commission's original short-run focus on the narrow competition standard of substitutability of recyclable for virgin products in existing industrial processes.[24] The railroads have not produced evidence to meet their burden of proving that lower relative rates for recyclables will not encourage industrial producers, in the long run, to make greater use of recyclables.[25] In fact, the survey results considered by the Commission in its reopened proceeding indicate the opposite.[26] Under the mandate of the *NARI I* opinion, therefore, the Commission's findings of competition are reasonable and in accordance with law.

### C.

As to the third step of the discrimination inquiry, the Commission settled the issue with little ado by inferring that where revenue-cost ratios for recyclables are higher than those for competing virgin materials, the shippers of those recyclable materials will be competitively injured. The Commission observed that due to the many factors influencing demand for recyclables, it is difficult to determine the precise effect of recyclable rates upon shippers. As a theoretical matter, however, it is reasonable to infer that if there is a potential for competition between a recyclable product and a virgin material, then a relatively higher rate for the former will have a potential to injure shippers and users of the recyclable relative to shippers and users of the virgin material. Any competition between the commodities will naturally have an effect on shippers and users. In an earlier ICC investigation of nationwide railroad rate structures, the Supreme Court

---

22. *See* 361 I.C.C. at 242–43.

23. *See, e. g.*, 361 I.C.C. at 250 (scrap iron and steel competes with iron ore); *id.* at 254–55 (aluminum scrap competes with bauxite ore).

24. *See NARI I*, 585 F.2d at 540.

25. *See id.* at 540 n. 87.

26. *See* 361 I.C.C. at 241–42.

allowed an inference of competitive injury without direct statistical proof.[27]

To prove actual injury for shippers of each recyclable in the present case would have been immensely burdensome, if not impossible, in light of the complexity of the evidence and the factors pertaining to causation. In this case it is especially difficult to challenge the Commission's finding of competitive injury, because the railroads bore the burden of proof in this investigation, unlike other proceedings of this nature. Since a finding of competition can logically and theoretically support an inference that shippers are potentially injured by discriminatory rates, it was up to the railroads to show that injury does not in fact occur. Our earlier *NARI I* opinion held that the record at that time did not support a finding of no competitive injury.[28] The same is true of the present record. In complex issues of this nature, related to ratemaking, the Commission deserves considerable deference to its expertise. We therefore uphold the Commission's finding of competitive injury based on the current record and in light of the unique feature in this case that the burden of proof rests on the railroads.

### D.

■ The final step of the discrimination inquiry is to determine whether transportation characteristics justify rate disparities between competing products. By comparing revenue-cost ratios rather than rates in the initial stage of its inquiry, the Commission took into account at the outset one of the major transportation characteristics, the differences in variable cost of transporting various materials. There remain other characteristics, however, that are also relevant to this final step in a discrimination investigation. These include cost differences not reflected in the Commission's revenue-cost ratios, value of the product shipped (higher value can justify a relatively higher rate), and competition by motor

carriers or barge lines for traffic in a particular commodity (which could call for a relatively lower rate).

The ICC decision of 16 April 1979 demonstrates that the Commission received and considered evidence of transportation characteristics offered to justify disparities in revenue-cost ratios. For some alleged differences in characteristics, the Commission concluded that its revenue-cost ratios already took them into account.[29] For others, the Commission found lack of quantification of the alleged differences.[30] The Commission considered evidence offered to show differences in value of commodities, but generally rejected it as a justification of ratio disparities.

■ We find all these decisions to be the type traditionally within the discretion of the Commission. The ICC decision gives consideration to the significant offers of evidence to justify disparities; thus it suffers no procedural deficiency. As to substantive conclusions, it is not our place to second-guess the Commission, so long as it has offered reasonable explanations for its conclusions, supported on the record. We find in this case that it has.

Since we find no fatal defect in the Commission's four-step discrimination analysis, we uphold the Commission's findings pertaining to unjust discrimination. We do not find error in the Commission's reliance upon the data of its initial investigation. Our holding does not imply full satisfaction with the Commission's procedures, especially its two-month delay in reopening its investigation following remand from this court. Nor do we express full confidence in the precision of the Commission's estimates of ratios and evaluation of rate disparities. These suffer from various inaccuracies, as the Commission itself admits,[31] and as its two subsequent orders correcting erroneous data clearly indicate. By using old revenue and cost data, updated by methods that can

---

**27.** *See New York v. United States*, 331 U.S. 284, 310, 67 S.Ct. 1207, 1220, 91 L.Ed. 1492 (1947).

**28.** *See NARI I*, 585 F.2d at 540.

**29.** *See, e. g.*, 361 I.C.C. at 251, 255–56.

**30.** *See id.* at 251.

**31.** *See id.* at 239–40.

only estimate and not accurately pinpoint the relevant data, the Commission fell considerably short of the accuracy it should generally strive for. But this case represents an immensely complex task performed within statutory and court-mandated time limits. The procedures and substantive conclusions were largely entrusted by choice of Congress to an agency normally having discretion over these matters. In this perspective, we conclude that the Commission's decision in *Ex Parte No. 319 (Sub-No. 1)*, with its admitted defects, is a reasonable resolution of its duty to investigate and identify instances of unjust discrimination.

The railroads, we note, complain of an inadequate record on which to base the Commission's decision in this case. But the relevant information is largely in the hands of the railroads. It is not unfair that some shortcomings in the record should operate to the railroads' disadvantage. For example, the Commission found that allegations of high value and high shipping cost for iron and steel scrap were not quantified and convincingly presented as a justification for higher rates;[32] but the evidence for such values and costs and their effect on the rate structure is available to railroads, and it is their burden to present it in a comprehensive and convincing fashion. That the railroads should suffer at various points in this proceeding as a result of inadequacies in the record is the consequence of Congress's shift of the burden of proof onto them in this proceeding.

The Commission's investigation schedule, it is true, left little time to submit data— but the railroads had opportunities in two investigations to submit data, and while the procedures and especially the Commission's delay on remand burdened the railroads, the railroads had enough opportunities that we cannot now overturn the Commission's findings for lack of sufficient evidence—which

is in the railroads' hands. Although our earlier *NARI I* opinion contemplated further major submissions of data by the railroads on which the Commission would rely, the opinion did not object to the old data base upon which the first Commission decision relied.[33] The Commission has now complied with *NARI I's* directive to broaden the definition of competition and to determine whether rate disparities are justified by transportation characteristics submitted into evidence. The Commission has complied with this mandate to the extent possible given the data available to it. We therefore do not remand on the basis of its reliance on the old data, nor on the various imperfections alleged in the record.

■ A further challenge is raised to the Commission's order of 26 September 1979, which changed certain revenue-cost data in ways that affected the remedies required. As this action was taken after the expiration of the court-imposed time limit on this investigation, we would be most reluctant to permit any action that amounts to a continuation of that investigation. In cases where no judicial time limit is imposed on ICC actions, the Commission has authority to rehear and change any order at any time,[34] so long as the Commission's action is not inconsistent with a reviewing court's jurisdiction.[35] In the 26 September 1979 modification order, the Commission has merely corrected errors in its data, while maintaining the same methodological approach in its decision. This is consistent with the Commission's authority to correct ministerial mistakes,[36] and could be achieved in any case through the Commission's continuing supervisory authority over recyclable shipping rates. We therefore do not vacate the modification order of 26 September 1979.

---

32. *See id.* at 251–52.

33. *See NARI I*, 585 F.2d at 533–35.

34. *See American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 540, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (1970).

35. *See id.* at 541, 90 S.Ct. at 1293.

36. *See American Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958); *Sober v. Interstate Commerce Commission,* 202 U.S.App.D.C. ——, 628 F.2d 36, at 42 (D.C.Cir.1980).

### III.

Having upheld the Commission's finding of instances of unjust discrimination, we review now the Commission's remedy for that discrimination. The ICC decision of 16 April 1979 required the railroads to eliminate unjust discrimination, and explained that this could be done either (1) by raising one group of rates to produce the same revenue-cost ratio as the other group, (2) by lowering the other group to produce the same ratio as the first group, or (3) by equalizing the revenue-cost ratios at some other level.[37] The resulting revenue-cost ratio must be the same for both groups of commodities and must be reasonable. As we discuss below, the Commission established a reasonableness standard at a 180 percent ratio of revenue to variable cost. To remedy discrimination whenever it is found between competing groups of recyclable and virgin commodities, the railroads are thus permitted to adjust rates so that revenue-cost ratios are equal between the two groups, and below 180 percent. In this manner railroads have been able to remedy discrimination by means of large rate increases for both virgin and recyclable materials. In fact, the Commission has allowed rate increases for recyclables whenever the revenue-cost ratio is below 180.[38]

Several petitioners object to these rate increases and propose alternative remedies for the Commission to impose; for instance, equalizing revenue-cost ratios at any level between the lower (advantaged) commodity group ratio and the higher (prejudiced) commodity group ratio. This would prevent increases in the rates of recyclables as a "remedy" for discrimination against them. A second proposal is to allow equalization of revenue-cost ratios at such levels that aggregate railroad revenues remain the same as before.[39]

Congress did not specify in section 204 what remedy should be employed to eliminate unjust discrimination. In past cases of rate discrimination the Supreme Court has addressed the issue of what remedies the ICC may prescribe and allow to the railroads, with resulting guidance, however, not entirely clear. In *American Express Co. v. Caldwell*,[40] the Court dealt with an ICC discrimination order that prohibited higher rates on one route than on several others. To comply with the order, the Court said, the railroad could raise one rate to equal the other, lower the other to equal the first, or reduce one and raise the other "until equality is reached in an intermediate scale."[41] This formulation limits the remedial equalized rate to a level *not less than* the original advantaged rate and *not greater than* the original prejudiced rate. A later Supreme Court opinion, while citing the *American Express* opinion favorably, does not expressly restrict possible remedies to an intermediate range between the two original rates.[42]

Whatever doubt we might entertain about limiting the ICC to the *American Express* intermediate range for discrimination remedies in general, we find in the context of this proceeding under section 204 that such a limitation on remedies is especially appropriate. The clear congressional intent behind section 204 was to remove barriers to increased levels of recycling, if such barriers should be found to exist.[43] Now that the Commission has found unjust discrimination against recyclables, it would surely be ironic for this finding to result in an increase in the rates and "barriers" for such materials. We hold, therefore, in light of expressed congressional intent, that the language in *American Express* limiting remedies for discrimination is applicable to this section 204 proceeding. We must ac-

---

**37.** *See* 361 I.C.C. at 243.

**38.** *See id.* at 648–50.

**39.** *See* Brief of Petitioners Southern Paper Traffic Conference at 13–17.

**40.** 244 U.S. 617, 37 S.Ct. 656, 61 L.Ed. 1352 (1917).

**41.** *Id.* at 624, 37 S.Ct. at 660.

**42.** *See Texas & P. Ry. v. United States*, 289 U.S. 627, 650, 53 S.Ct. 768, 776, 77 L.Ed. 1410 (1933).

**43.** *See NARI I*, 585 F.2d at 532, 535; S.Rep. No. 499, 94th Cong., 1st Sess. 51 (1975).

cordingly vacate the Commission's decision as to remedies for unjust discrimination, and require that remedies result in equalization of ratios at a level not higher than the original ratio for recyclables which was found to be discriminatory.

The Commission does have authority to limit remedies even further if it chooses, through its statutory obligation to ensure that new rates filed by carriers to remove discrimination are reasonable.[44] It will be up to the Commission on remand to resolve claims of unreasonable increases in virgin materials shipping rates, as well as claims that railroads should not reap sizable gains in revenue through the remedy process. The Commission has discretion to equalize discriminatory rates at a level lower than the higher, prejudiced rate, though it is not required by law to do so.[45]

Where railroads have already "remedied" discrimination by increasing recyclable rates, however, these increases must be revoked as inconsistent with the extent of the Commission's authority to remedy discrimination under section 204. Also, in order to exercise its discretion rationally upon remand, the Commission must review all railroad rate changes made to remedy discrimination, to ensure that increases in rates are not unreasonably large. If it determines that any such increases are unnecessarily large, the Commission has discretion to require a reasonable increase in the advantaged rate combined with some decrease in the prejudicial rate to equalize revenue-cost ratios at a reasonable level and remedy discrimination.[46]

### IV.

█ Finally, we review the Commission's standard for reasonableness of recyclable shipping rates. In this case, unlike other ICC investigations into reasonableness of rates, the Commission established a standard based solely on the factor of variable cost. Under this standard, rates for recyclables must result in weighted revenue-variable cost ratios of less than 180 percent. By contrast, the usual reasonableness investigation involves a weighing of many other factors. The Commission chose a simplified approach in this proceeding due to the complexity of and time constraints on its investigation.[47] In light of these factors, we find it reasonable and within the Commission's discretion to use such a simplified standard based on revenue-cost ratio. Our *NARI I* opinion did not decide whether the Commission had authority to adopt a maximum reasonableness standard of this sort, but did give strong hints toward a possible rationale for the adoption of such a standard if the Commission so elected.[48] The Commission has now stated a reasonable explanation for following this approach, and we uphold its decision to this extent.

Concerning the particular figure chosen as the maximum reasonableness standard, we must ensure that the Commission has explained its decision and based it on record support. Our standard of review on this issue is deferential to the Commission's expertise in setting rates, and we refrain from substituting our judgment for the Commission's on the matter of what figure to choose.

█ On the present record, however, we find a disturbing lack of support and explanation for the 180 percent ratio which the Commission selected. The Commission's rationale for selecting this figure can be briefly summarized. The Commission began by mentioning three revenue-variable cost ratios, 127, 160, and 180 percent, which "have played a significant role in Commission proceedings."[49] Looking at each of these figures in turn, the Commission re-

---

**44.** *See, e. g., Soybeans for Export, Midwest to Gulf Ports and Chicago*, 350 I.C.C. 650, 660–61 (1975); *Boots and Shoes from Various New York Points to Trunk Line and New England Territories*, 91 I.C.C. 591, 596 (1924).

**45.** *See New York v. United States*, 331 U.S. 284, 335, 67 S.Ct. 1207, 1234, 91 L.Ed. 1492 (1947).

**46.** *See Soybeans for Export, Midwest to Gulf Ports and Chicago*, 350 I.C.C. 650, 660–61 (1975).

**47.** *See* 361 I.C.C. at 244.

**48.** *See NARI I*, 585 F.2d at 537–38 & n.78.

**49.** 361 I.C.C. at 245.

jected 127 percent, the ratio of railroad fully allocated costs to fixed costs, because it would force recyclable rates down to the point where other rail traffic rates would have to subsidize the shipping of recyclables. Next, the Commission stated that ratios below 160 percent "do not exceed a maximum reasonable level," because railroads are presumed at such ratios not to have market dominance, for purposes of defining ICC jurisdiction to review rates for reasonableness.[50] Finally, the Commission considered the ratio of 180 percent because it had "not even investigated rate increases which result in revenue-to-variable cost ratios of less than 180 percent in the recent general rate increases."[51] Since a standard of 160 allows railroads to earn a sufficient return on investment, the Commission concluded, a standard of 180 "allows the railroads an even greater opportunity to earn an adequate return . . . ."[52]

While we hesitate to vacate decisions of this sort, which rely on rate-setting expertise, we find the Commission's decision simply too arbitrary and unreasoned to uphold. To restrict scrutiny to three figures because they have played a "significant role" does not begin to explain why those figures are to be preferred to the exclusion of all others for this particular proceeding. The Commission's specific choice of a ratio of 180 has even less support. That it offers an "even greater opportunity" for return on capital might explain why it is not an unreasonably low figure, but it does not even attempt to explain why it might not be unreasonably high.

These gaps in the Commission's reasoning appear all the more striking when we examine the guidance this court has already given the ICC in similar cases in the past. In our NARI I decision itself, addressing the very issue of a possible standard of maximum reasonableness, this court stated that "in measuring the appropriate standard the Commission might even have allowed for a reasonable margin of profitabil-

ity under the rate structures."[53] Any ambiguity in the guidance in our NARI I opinion is dispelled by an examination of our opinion in Atchison, Topeka, and Santa Fe Railway v. Interstate Commerce Commission,[54] where we remanded the 160 percent ratio figure for the market dominance presumption precisely because the Commission had failed to support its choice of this ratio with an explanation of what profit margin it would produce for the railroads and what level of profit was fair.[55] Yet in the present case, the ICC made no attempt in its decision to predict the profit margin which would result from a ratio of 180 percent, and made no attempt to analyze the fairness of that level of profit.

We do not hold that a "reasonable" level of profit for an investigation of this sort may never exceed the average level of profit, nor do we attempt to prescribe the substantive result at which the ICC must arrive. But we require that the ICC must first examine the profit level that results from its prescribed standard of reasonableness for rates, and then justify higher than normal profitability levels by traditional standards such as, for instance, a relatively high value of commodities shipped, or a need for higher than normal profits for one line in order to subsidize less profitable operations on other lines. Because of the complete lack of such explanatory discussion of fundamental considerations, we must vacate the Commission's choice of a 180 percent ratio standard for reasonableness, and remand for the Commission to hold further proceedings to define what rates for recyclables are unreasonable. Any increase in ratios for recyclables toward the 180 percent level, made by railroads as a result of and in relation to the Commission's decision of 16 April 1979, must be revoked until such time as the ICC issues a new determination of what rates are reasonable. This required revocation does not, of course, affect general rate increases.

**50.** *See id.*

**51.** *Id.* at 246.

**52.** *Id.* at 247.

**53.** *NARI I*, 585 F.2d at 537.

**54.** 580 F.2d 623 (D.C.Cir.1978).

**55.** *See id.* at 635.

## V.

We do not fix a rigid time limit on remand for the Commission to define reasonableness, but we stress the importance of expedition as mandated by Congress in section 204. Accordingly we retain jurisdiction over this investigation and require a report from the ICC six months from the date of this decision, stating progress achieved on the reasonableness issue and expected completion date of the remand. On the issue of remedies for unjust discrimination, the remand is narrow and manageable; we therefore require that the Commission define permissible remedies for discrimination within this six-month period. We also note that section 204 requires reports from the ICC to the President and Congress where appropriate, as the Commission is required to conduct investigations of the recyclables rate structure. In our exercise of continuing supervision over this action, we intend the Commission to investigate complaints concerning the rate structure for recyclables as the structure is modified by this remand.

Once the Commission has remedied unjust discrimination and unreasonableness in the rate structure, it can proceed with general rate increases without undue burden from constant investigation of recyclables. If the Commission imposes a reasonable upper limit on revenue-variable cost ratios, this limit need not be continually changed to account for inflation. The cost factors in the denominator of this fraction will naturally increase along with inflation, thus allowing a proportionate increase in rates and revenues for recyclables. If rates are increased no more than the inflation rate, these increases will not result in aggravation of discrimination as measured by the revenue-cost ratios. Thus across-the-board increases that merely compensate for inflation do not disturb the rate structure or create greater disparities in real rates.

With these guides to the Commission's actions, and our continuing jurisdiction to supervise this proceeding, we vacate the order before us and remand for proceedings not inconsistent with this opinion.

*So ordered.*