TRANS–PACIFIC FREIGHT CONFER-
ENCE OF JAPAN/KOREA, et
al., Petitioners,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Latin America/Pacific Coast Steamship
Conference, et al., Australia/Eastern U.
S. A. Shipping Conference, et al., Gulf-
Mediterranean Ports Conference, Gulf
European Freight Assoc., Continental-
US Gulf Freight, United Kingdom/USA,
Intervenors.

SEA–LAND SERVICE, INC., Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

Gulf European Freight Association, et
al., United Kingdom/USA,
Intervenors.

Nos. 78–2172, 79–1062.

United States Court of Appeals,
District of Columbia Circuit.

Argued 14 Dec. 1979.

Decided 11 Sept. 1980.

Charles F. Warren, Washington, D. C., with whom George A. Quadrino, Washington, D. C., was on brief, for petitioners in No. 78–2172.

Francis W. Fraser, Washington, D. C., with whom Edward M. Shea, Washington, D. C., was on brief, for petitioner in No. 79–1062.

Carol J. Neustadt, Atty., Federal Maritime Commission, Washington, D. C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, John J. Powers, III and Robert J. Wiggers, Dept. of Justice, Washington, D. C., were on brief, for respondents.

Also Eliot J. Halpern and F. Conger Fawcett, San Francisco, Cal., entered appearances for intervenor, Latin America/Pacific Coast Steamship Conference, et al., in No. 78–2172.

Also Stanley O. Sher and Marc J. Fink, Washington, D. C., entered appearances for intervenor, Australia/Eastern U. S. A. Shipping Conference, et al., in No. 78–2172.

Also Edward S. Bagley, New Orleans, La., entered an appearance for intervenor, Gulf-Mediterranean Ports Conference, in No. 78–2172.

Also Patricia E. Byrne, San Francisco, Cal., and Howard A. Levy, Encino, Cal., entered appearances for intervenor, Gulf

European Freight and United Kingdom/USA, et al., in No. 78–2172 and No. 79–1062.

Before ROBINSON and WILKEY, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

WILKEY, Circuit Judge:

This case is before the court on consolidated petitions to review an order issued by the Federal Maritime Commission (the Commission), amending Part 528 of its rules dealing with standards for self-policing systems,[1] pursuant to section 15 of the Shipping Act (the Act).[2] Petitioners are numerous ocean shipping conferences and rate agreements composed of both domestic and foreign carriers which ply the trade between various foreign and United States ports. Under section 15 of the Act, these conferences, subject to the Commission's approval, are permitted to fix transportation rates, as well as rules and regulations consistent with other substantive provisions of the Act, to which conference members must adhere. As a condition to the exemption from the antitrust laws contained in section 15, conferences are also required to ensure that members comply with the obligations contained in the conference agreements. If the Commission finds that conferences are inadequately policing compliance by the signatories, it is empowered to disapprove the conference agreement.

The rules promulgated by the Commission are intended to establish certain standards by which the Commission hereafter will judge the adequacy of the self-policing systems. These rules require the conferences to engage a self-policing body independent of the conference or rate fixing entity; grant the self-policing authorities certain investigatory powers that must be utilized; prescribe certain procedures for adjudication of breaches of the conference agreement, including the right to a hearing before an impartial arbitrator for accused members; and establish certain recordkeeping and reporting requirements. In addition, section 528.1(c) of the Commission's rules prohibits the conferences from inserting a provision in the conference agreements that would deny the Commission access to self-policing records or documents. Section 528.1(c) is also intended to aid the Commission in implementing its enforcement responsibilities under the Act.[3]

Petitioners attack these rules as beyond the rulemaking authority of the Commission.[4] In addition, petitioners raise several procedural objections to the Commission's adoption of the rules, including the contention that the Commission failed to afford petitioners adequate notice and opportunity for comment on certain of these provisions. For the reasons to be discussed, we conclude

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. See 46 C.F.R. § 528 (1978).

2. 46 U.S.C. § 814 (1976).

3. More specifically, the Commission referred in its final rules to sections 14, 16, 18(b) of the Shipping Act, 46 U.S.C. §§ 812, 815, 817(b) (1976). Sections 14 and 16 prohibit, *inter alia*, ocean carriers subject to the Act from paying rebates to shippers, granting any undue or unreasonable preferences, advantages, or disadvantages to any traffic, and discriminating through use of various unfair devices against any shipper. Any carrier who violates any provision of those sections shall be guilty of a misdemeanor punishable by fine of not more

than $25,000 for violations of section 14, and of not more than $5,000 for violations of section 16. Section 18(b) of the Act, 46 U.S.C. § 817(b), requires ocean carriers to file with the Commission all tariffs showing the rates and charges of such carrier and prohibits the carrier from charging or collecting any rate deviating from those filed with the Commission. Whoever violates this section shall be subject to a civil penalty of not more than $1,000 for each day such violation continues.

4. Petitioners in No. 79–1062 challenge only section 528.1(c) of the Commission's rules. For purposes of convenience, we shall refer to petitioners in No. 79–1062 as Sea-Land, and to petitioners in No. 78–2172 as Trans-Pacific.

that each of the objections is without merit and affirm the order of the Commission.

Full understanding of this case requires a brief historical review of the conference system and the administrative scheme under the Shipping Act of 1916 before and after the enactment of the 1961 amendments.

## I. STATUTORY AND FACTUAL BACKGROUND

In response to severe rate wars caused by a chronic excess supply of world shipping tonnage, ocean carriers in the last quarter of the nineteenth century began to join together into "conferences" for the purpose of stabilizing the trade by fixing rates and eliminating competition along particular world trade routes.[5] After an extensive investigation into the cartelization of the ocean shipping industry,[6] Congress passed the Shipping Act in 1916.[7] Aware of both the practical difficulty of any single government attempting to regulate the freight rates in an international industry as well as the perceived advantage of a stable rate system, Congress granted in section 15 of the Act an exemption from the antitrust laws for concerted rate activity by the conferences.

Congress, however, also sought to eliminate the worst abuses associated with the conference system by proscribing certain particularly unfair methods designed to drive out competitors from the trades.[8] In addition, in section 15 of the Act Congress required the conferences to file their agreements with the Shipping Board and obtain approval of those agreements from the Board.[9] Although Congress contemplated that the conferences themselves would control their members' adherence to the obligations under the agreements, the Shipping Board, charged with administering and enforcing other regulatory provisions of the Act,[10] was also given responsibility for overseeing adherence by the conference signatories to their agreements. Section 15 authorized the Board to "disapprove, cancel or modify" agreements found to be "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports," or between American exporters and their foreign competitors, or those found to be detrimental to United States commerce, or to violate any other provision of the Act.[11]

Thus the Shipping Act of 1916 established the basic pattern of federal regulation of the ocean freight industry for the next for-

5. *See generally* Antitrust Subcomm. of the House Comm. on the Judiciary, The Ocean *Freight Industry,* H.R.Rep.No.1419, 87th Cong., 2d Sess. (1962) [hereinafter cited as Celler Committee Report].

6. *See* House Comm. on Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H.R.Doc.No.805, 63d Cong., 2d Sess. (1914).

7. Shipping Act, ch. 451, 39 Stat. 728 (1914) (current version at 46 U.S.C. §§ 801–842 (1976)).

8. For example, section 14 of the Act prohibited ocean common carriers from retaliating against shippers who patronize other carriers by refusing space accommodation when space is available or using other discriminatory practices, from giving rebates to shippers on freights previously paid conditioned upon the shippers' exclusive use of the conference carrier (so-called "deferred rebates"), and from using "fighting ships," vessels operated at a loss, but subsidized by the conference. Shipping

Act, ch. 451, § 14, 39 Stat. 728, 733 (1914) (current version at 46 U.S.C. § 812 (1976)).

9. The Shipping Board was the designation of the original agency entrusted with the enforcement of the Shipping Act. With several intervening changes (U.S. Shipping Board 1933; U.S. Maritime Commission 1936; Federal Maritime Board 1950), these functions were transferred to the Federal Maritime Commission in 1961. *See* 26 Fed.Reg. 7315 (1961).

10. *See, e. g.,* note 8 *supra.* The Shipping Board was given the powers to order anyone subject to the Act to file reports and records under section 21, 46 U.S.C. § 820; under section 22, 46 U.S.C. § 821, to investigate violations of the Act either on complaint or on its own initiative; and under section 27, 46 U.S.C. § 826, to subpoena witnesses and documents for this purpose.

11. Shipping Act, ch. 451, § 15, 39 Stat. 728, 733 (1914) (current version at 46 U.S.C. § 814 (1976)).

ty-five years. The Act immunized the conferences' anticompetitive agreements from the antitrust laws for the purpose of securing more stable and uniform rates and, particularly important from the United States' viewpoint as the twentieth century progressed, protecting the economically weaker American-flag lines from destructive competition.[12] It proscribed certain especially cutthroat practices and, in addition, relied on the conferences themselves to regulate their members under the watchful supervision of the Shipping Board.

In practice, however, supervision of the conferences' self-regulatory efforts by the successive administrative bodies charged with this responsibility [13] proved woefully inadequate, as the investigations and hearings surrounding the 1961 amendments to the Shipping Act revealed.[14] The immediate impetus to amend the Act was the need to confirm the legality of so-called dual rate contracts, seriously called into question by a 1958 Supreme Court decision.[15] In the course of investigating the antitrust aspects of these dual rate contracts, however, the Antitrust Subcommittee of the House Judiciary (Celler Committee) uncovered over two hundred violations of the Shipping Act and conference agreements.[16] To a great extent, these involved various unfair means that carriers devised to undercut the agreed-upon rate schedules, ranging from cash rebates to shippers, absorption of shippers' storage and trucking costs, falsification of bills of lading to understate the applicable rate or weight of the shipment, to more sophisticated types of secret concessions designed to lure a shipper's business, including lavish gifts and entertainment.[17] These flagrant violations of the Shipping Act and conference agreements undermined whatever stability in the trade and protection for the American-flag vessels that the conferences were thought to afford.[18] Congress, while anxious to retain the conference system, thus recognized the urgent

---

**12.** This latter advantage coincides with the national maritime policy, embodied in other statutes as well, of promoting an American merchant marine, which is recognized as vital to both the national defense and the commercial welfare of the United States. *See, e. g., Alaska Bulk Carriers, Inc. v. Kreps,* 595 F.2d 814, 817–19 (D.C.Cir. 1979), *rev'd on other grounds sub nom. Seatrain Shipbuilding Corp. v. Shell Oil Corp.,* 442 U.S. 940, 99 S.Ct. 2880, 61 L.Ed.2d 309 (1980); *American Maritime Ass'n v. Blumenthal,* 590 F.2d 1156, 1158–59 (D.C.Cir. 1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979). It has long been acknowledged that the operating and capital costs of American-flag carriers are considerably higher than the operating and construction costs of foreign vessels. *See, e. g., id.;* Celler Committee Report, *supra* note 5, at 18–24. Although Congress for many years has authorized both a subsidy for ships constructed in United States shipyards and an operating-differential subsidy for manning of American-flag vessels with American crews. *See* 46 U.S.C. §§ 1151–1183 (1976), maintenance of freight rates at levels higher than otherwise would prevail in the absence of concerted rate action also assists in the effort to place American shipping operations on a parity with foreign competitors.

**13.** *See* note 9 *supra.*

**14.** *See* Celler Committee Report, *supra* note 5, at 223–302, 359–99; *Hearings on H.R. 6775 Before the Merchant Marine and Fisheries Sub-* comm. of the Senate Comm. on Commerce, 87th Cong., 1st Sess. 12–13, 16–20 (1961) [hereinafter cited as *Senate Hearings on H.R. 6775*].

**15.** Under a dual rate contract, the conference establishes freight rates at two levels, the lower of which is charged to merchants who agree to ship cargoes on vessels of conference carriers exclusively. In *Federal Maritime Bd. v. Isbrandtsen Co.,* 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), the Court held that dual rate contracts adopted by the conferences as "predatory devices" were violative of section 14 of the Shipping Act of 1916. Congress amended section 14b of the Shipping Act in 1961 to authorize the use of these contracts. *See* Act of 3 Oct. 1961, Pub.L.No.87–346, § 1, 75 Stat. 762 (codified at 46 U.S.C. § 813a (1976)).

**16.** *See* Celler Committee Report, *supra* note 5, at 249–84; *Senate Hearings on H.R. 6775, supra* note 14, at 12 (statement of Representative Celler).

**17.** *See* Celler Committee Report, *supra* note 5, at 249–84, 107 Cong.Rec. 19,332, 19346–74 (Senate debate on H.R. 6775).

**18.** *See, e. g.,* Celler Committee Report, *supra* note 5, at 251–54; S.Rep.No.860, 87th Cong., 1st Sess. 1–3 (1961), U.S.Code Cong. & Admin. News 1961, p. 3108; H.R.Rep.No.498, 87th Cong., 1st Sess. 1–7 (1961).

need to enact more effective regulation to curtail malpractices in the ocean shipping industry.[19]

Fully aware of the international complexities involved in attempting to tighten control over conference self-policing systems, Congress nevertheless was determined to curb abuses in the trades and thus amended section 15 of the Shipping Act to provide: "The Commission shall disapprove any [conference] agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it . . . ."[20] In section 15 Congress thus commanded the conferences to make their self-regulation effective or risk disapproval of the conference agreements and as a consequence lose their antitrust immunity. Congress also made clear that the mandatory self-policing clause was intended to "in nowise diminish the powers, duties, and responsibilities" of the Commission under the Act.[21] Indeed, Congress amended section 15 to enlarge the Commission's powers over agreements filed under that section[22] and entrusted to the Commission the obligation of ensuring that conferences fulfill their duty to adequately police their members. Of central importance to the Commission's ability to carry out its substantive responsibilities was Congress's decision to add a new provision, section 43, which vastly expanded the Commission's rule-making powers under the Act.[23]

Shortly after the enactment of the 1961 amendments, the Commission used its rule-making powers to implement its obligation under section 15 to disapprove any conference agreement, on a "finding of inade-

quate policing of the obligations under it," by promulgating General Order 7.[24] That order prescribed general reporting requirements and directed the conferences to include in their agreements filed with the Commission a general description of the methods used to police the obligations contained in those agreements. Although in section 15 of the Act Congress conditioned the continued legality of the conference agreements upon adequate self-policing, the Commission's investigations over the next ten years indicated that major incidences of rebating in the trades remained a pervasive and perennial problem.[25] Confronted with the conferences' utter failure to control these violations of conference agreements and the Shipping Act, the Commission determined that greater guidance should be given to the industry concerning the scope and type of self-policing systems required to fullfill the conferences' obligation to regulate their members adequately. While Congress had reaffirmed its desire for a self-policing system, presumably an *effective* self-policing system was intended; hence the Commission perceived a duty to carry out this intent of Congress.

Accordingly, on 23 February 1973 the Commission issued a notice of proposed rulemaking (in Docket No. 73–5) to revise regulations governing section 15 agreements generally and to amend General Order 7 dealing particularly with self-policing systems.[26] The notice proposed to change the self-policing rules to require the conferences to engage a policing body indepen-

19. As used in the trade, the term "malpractices" connotes any act, omission, or course of dealing which violates a provision of the Shipping Act, a conference agreement or regulation, or otherwise constitutes an unfair method of competition. *See* Celler Committee Report, *supra* note 5, at 249.

20. Act of 3 Oct. 1961, Pub.L.No.87–346, § 2, 75 Stat. 762, 763 (codified at 46 U.S.C. § 814 (1976)).

21. H.R.Rep.No.498, 87th Cong., 1st Sess. 10–11 (1961).

22. For example, Congress added the public interest standard to section 15, which empow-

ered the Commission to disapprove any conference agreement on a finding that such agreement would be contrary to the public interest. *See id.* at 18.

23. Act of 3 Oct. 1961, Pub.L.No.87–346, § 7, 75 Stat. 762, 766 (codified at 46 U.S.C. § 841a (1976)).

24. *See* 46 C.F.R. § 528 (1963) (superseded).

25. *See* notes 51–53, 67 *infra* and accompanying text.

26. 38 Fed.Reg. 4982 (1973).

dent of the conference or rate fixing body (neutral body), directed that entity to "constantly police" the activities of the conference members through surprise audits and inspections of books and records, and required copies of all records of self-policing activities to be maintained in the United States, available for the Commission's inspection. In addition, these records were required to show the identity of a party found to have violated a conference agreement following the final disposition of a disciplinary proceeding.

Concluding that the issues pertaining to the self-policing systems were of sufficient significance to warrant separate consideration, the Commission on 17 October 1973 issued a new notice of proposed rulemaking (in Docket No. 73–64) for the sole purpose of amending the self-policing regulations.[27] These proposed rules retained the neutral body requirement, unless the conferences qualified for an exemption set forth in the rule; retained the requirement that these self-policing entities provide the Commission upon request with a copy of all records of self-policing activities, permitting, however, the names of the parties involved to be deleted; and broadened considerably the original reporting provisions set forth in General Order 7 to require semi-annual reports showing the general nature and basis of each investigation, the findings with respect to each, and a specific description of the violations found and sanctions imposed.

After permitting interested parties an opportunity to comment on the proposed rules, the Commission promulgated on 18 April 1978 what were termed "Final Rules" (April rules).[28] These rules also contained the requirement of a neutral body policing authority, invested this body with more expansive investigatory and adjudicatory powers, required more detailed reports to the Commission of investigations and adju-

dications of breaches, and in response to considerable opposition in the industry eliminated the provision directing the self-policing authorities to permit the Commission access to self-policing records.

The Commission entertained nineteen petitions for reconsideration. After evaluating these petitions, the Commission on 14 September 1978 issued its "Reconsideration and Modification of Final Rules" (September rules).[29] These final rules amended the April rules to simplify the reporting requirements to an extent, required the policing bodies to maintain more extensive records of their investigatory activities, and added a provision which prohibited the conferences from denying the Commission access to self-policing records. The Commission denied petitioners' requests for reconsideration of the September rules and affirmed these rules by order on 18 December 1978. This appeal followed.

## II. ANALYSIS

Only petitioner Trans-Pacific challenges, on both substantive and procedural grounds, those provisions of the Commission's rules which require the conferences to engage a self-policing body independent of the conference or rate fixing entity;[30] grant that self-policing entity certain investigatory powers that must be followed, including the requirement that the policing body conduct inspections and audits of the conference members' records and other documents;[31] prescribe minimum procedural safeguards for adjudication of breaches, including the right to a hearing before an "impartial arbitrator";[32] and establish certain recordkeeping[33] and reporting requirements[34] with respect to self-policing investigations and adjudications. Both petitioners Trans-Pacific and Sea-Land object, on both substantive and procedural grounds, to

27. *Id.* at 28,841.

28. 43 *id.* at 18,175 (28 Apr. 1978).

29. *Id.* at 42,757 (21 Sept. 1978).

30. 46 C.F.R. § 528.3(b) (1978).

31. *Id.* § 528.2(c).

32. *Id.* §§ 528.1(b), 528.2(d), 528.4.

33. *Id.* §§ 528.2(c)(1)(v), 528.3(f).

34. *Id.* § 528.5.

the Commission's promulgation of section 528.1(c), which prohibits the conferences from inserting any clause in their conference agreements that would deny the Commission access to self-policing records or documents. With the regulatory and historical background in mind, we turn first to those regulations attacked solely by Trans-Pacific.

A. *Neutral Body Provision, Investigatory and Adjudicatory Procedures, and Recordkeeping and Reporting Requirements*

1. *Statutory Authority*

■ Trans-Pacific challenges these rules first on the grounds that both a plain reading of section 15 as well as the legislative history of that section indicate that the Commission is precluded from prescribing in advance, through its rulemaking powers, detailed standards by which it will thereafter appraise the adequacy of the conferences' self-policing systems. Petitioner insists that the Commission instead is limited to determining on an *ad hoc* basis, after notice and hearing, whether a conference adequately is policing its members. In *Outward Continental North Pacific Freight Conference v. Federal Maritime Commission*,[35] this court rejected the same objections raised to the Commission's adoption of General Order 7, the predecessor regulations to those at issue in this case, as inconsistent with both the regulatory scheme envisioned under the 1961 amendments as

well as with settled principles of administrative law.[36] For much the same reasons, we now reject petitioner's challenges to the Commission's rules as totally devoid of merit.

Section 15 provides in relevant part: "The Commission shall disapprove any [conference] agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it."[37] Trans-Pacific first argues that a plain reading of section 15 indicates that the Commission is limited to withdrawing approval of an agreement after notice and hearing and a specific finding that the actual policing operations of a particular conference are inadequate. In essence, petitioner's claim is a denial of the Commission's power to proceed by rulemaking, a contention that this court rejected in *Pacific Coast European Conference v. Federal Maritime Commission* as a "doctrinal archaism in modern administrative law."[38]

■ Where an administrative agency has been granted both rulemaking and adjudicatory powers, the statutory requirement of a hearing does not preclude necessarily an agency from particularizing those statutory standards through the rulemaking process and denying a hearing at the outset to those who are in violation of the rules.[39] This doctrine rests on a simple but fundamental principle of administrative law: to make the administrative process effective, an agency must have the discretion to proceed either by general rule or by *ad hoc* litigation.[40] Rulemaking is an essential

---

**35.** 385 F.2d 981 (D.C.Cir. 1967).

**36.** The court in *Outward Continental* largely relied on this court's reasoning in *Pacific Coast European Conference v. FMC*, 376 F.2d 785 (D.C.Cir. 1967). That case rejected a challenge to the Commission's use of its rulemaking powers to define another clause of section 15, which provides that "[n]o [conference] agreement shall be approved . . . which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade." 46 U.S.C. § 814 (1976).

**37.** 46 U.S.C. § 814 (1976).

**38.** 376 F.2d 785, 789 (D.C.Cir. 1967). *See* note 36 *supra.*

**39.** *See, e. g., Federal Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 39–41, 84 S.Ct. 1105, 1109–1110, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 202–06, 76 S.Ct. 763, 770–72, 100 L.Ed. 1081 (1956); *American Airlines, Inc. v. CAB*, 359 F.2d 624, 628–30 (D.C.Cir.) (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

**40.** *E. g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 291–95, 94 S.Ct. 1757, 1770–72, 40 L.Ed.2d 134 (1974); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 770–72, 89 S.Ct. 1426, 1432–33, 22 L.Ed.2d 709 (1969) (Black, J., concurring); *Federal Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 39–41, 84 S.Ct. 1105, 1109–1110, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 202–06, 76 S.Ct. 763,

component of the administrative process and indeed is often the preferred procedure for the evolution of agency policies.[41] Rulemaking permits more precise definition of statutory standards than would otherwise arise through protracted, piecemeal litigation of particular issues. It allows all those who may be affected by a rule an opportunity to participate in the deliberative process, while adjudicatory proceedings normally afford no such protection to nonparties. And because rulemaking is prospective in operation and general in scope, rather than retroactive and condemnatory in effect, interested parties are given advance notice of the standards to which they will be expected to conform in the future, and uniformity of result is achieved.[42]

■ Under general principles of administrative law, then, an agency is not to be constricted by the formalities of the adjudicatory process in the absence of a clear congressional intent to the contrary.[43] Under the particular statutory scheme at issue, Congress added in the 1961 amendments to the Shipping Act section 43, which empowered the Commission to "make such rules and regulations as may be necessary to carry out the provisions of this Act."[44] *Congress thus expressly made section 43 applicable to all sections of the Act.* We find nothing in the language of section 15 requiring "notice and hearing" that subtracts from the Commission's rulemaking powers either expressly or by implication.[45]

Nor does anything in the legislative history of the 1961 amendments to section 15 of the Act negate the extension of the Commission's rulemaking powers to that section. Trans-Pacific's argument that Congress withheld from the Commission the authority to promulgate standards applicable to all conferences and rate fixing entities which the Commission deems necessary for adequate self-policing is predicated on Congress's rejection of an amendment to section 15 that the House proposed in H.R. 6775. That amendment provided: "No conference agreement shall be approved unless the [Commission] finds that it contains effective provisions for policing the obligations under it."[46] In striking this provision and substituting the language that eventually was enacted into law, the Senate noted only that:

> We also deleted a provision which would have amended section 15 to require that no conference agreement could be approved unless the Commission found

---

770–72, 100 L.Ed. 1081 (1956); *SEC v. Chenery Corp.*, 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1579–80, 91 L.Ed. 1995 (1947). "[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203, 67 S.Ct. at 1580. *See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524–25, 543, 98 S.Ct. 1197, 1202–03, 1211, 55 L.Ed.2d 460 (1978).

41. *See, e. g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292, 94 S.Ct. 1757, 1770, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *Pacific Coast European Conference v. FMC*, 376 F.2d 785, 789 (D.C.Cir. 1967); *American Airlines, Inc. v. CAB*, 359 F.2d 624, 629 (D.C.Cir.) (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); K. Davis, Administrative Law Treatise § 7.25 (2d ed. 1979); Shapiro, *The Choice of Rule Making or Adjudication in the Development of Administrative Policy*, 78 Harv.L.Rev. 921, 929–41 (1965).

42. *See, e. g., United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973); *FTC v. Brigadier Indus. Corp.*, 613 F.2d 1110, 1116–18 (D.C.Cir. 1979); *American Airlines, Inc. v. CAB*, 359 F.2d 624, 631 (D.C.Cir.) (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); K. Davis, Administrative Law Treatise § 7.25 (2d ed. 1979).

43. *See, e. g., American Airlines, Inc. v. CAB*, 359 F.2d 624, 629 (D.C.Cir.), (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

44. Act of 3 Oct. 1961, Pub.L.No.87–346, § 7, 75 Stat. 762, 766 (codified at 46 U.S.C. § 841a (1976)).

45. *See Outward Continental N. Pacific Freight Conference v. FMC*, 385 F.2d 981, 983–85 (D.C. Cir. 1967); *Pacific Coast European Conference v. FMC*, 376 F.2d 785, 788–90 (D.C.Cir. 1967).

46. *See* H.R.Rep.No.498, 87th Cong., 1st Sess. 40 (1961).

that the agreement contained "effective" provisions for policing the obligations under it. Your committee's amendment would require the Commission to disapprove any conference agreement if it found, after notice and hearing, that as among the members there had been inadequate policing and enforcing of their obligations under the agreement.[47]

This exchange of language must be viewed in its proper context. By merely deleting the House proposal, Congress could not have intended to impair the Commission's newly granted rulemaking authority under section 43: to reiterate, Congress extended that section's coverage to all provisions of the Act.[48] With that in mind, the Senate's action may be interpreted to mean no more than it did not consider it wise to *require* the Commission to assess the "effectiveness" of self-policing methods *at that time*, before the Commission had any opportunity to observe how the self-policing systems would function under the 1961 revisions—which tied the continued legality of the conference agreements to adequate self-policing.[49] Indeed, this court in *Outward Continental North Pacific Freight Conference v. Federal Maritime Commission*, on rejecting an argument that the Commission

was precluded from requiring the conferences as a general rule to include certain provisions in their agreements, interpreted the Senate's action in exactly this manner. After reciting the Senate's deletion of the House language, the court stated that "other legislative history indicates that what Congress objected to was not any requirement of a provision in the agreement but rather the requirement of *effective* provisions which must be included *before* the agreements could be approved in 1961."[50]

■ Petitioner's final, substantive objection to the rules is a general rather than specific challenge to any particular provision: namely, that these rules taken together as a whole are contrary to congressional intent that the conferences engage in self-regulation. By prescribing the kind of self-policing body that must be employed, as well as dictating to that body the procedures that must be followed for investigating and adjudicating breaches of conference agreements, the type of records that must be maintained, and the type of reports that must be submitted to the Commission, petitioner claims that the Commission has removed all flexibility and discretion from the conferences in conducting their self-policing

47. S.Rep.No.860, 87th Cong., 1st Sess. 17–18 (1961), U.S.Code Cong. & Admin.News 1961, p. 3124.

48. *E. g., id.* at 20.

49. The following exchange between Donald Wierda, a representative of the American Steamship Committee on Conference Studies, and Senator Engle, Chairman of the Senate Subcommittee on Merchant Marine and Fisheries, is illustrative:

Mr. Wierda. While we are on that subject, Senator, we would like to refer to page 6, line 14 [of the draft bill], which provides that—
No conference agreement shall be approved unless the Board finds that it contains effective provisions for policing the obligations under it.
The American-flag lines have no objection whatsoever; as a matter of fact, we support having the obligation for policing the conference agreement to be included in the basic agreement of the conference. On the other hand, we feel that this prior requirement that the conference agreement include it before the Board can even approve a conference

agreement is not reasonable. Today this neutral body system and other systems for policing are very new. We are groping, trying to find the best way of doing it. We don't think that the Board today knows what an effective policing system is. We don't think that they will know in the next year, either, because we have had these things in effect for a year, two, or three, and we are learning everyday something is wrong with it and how they can be improved.
We would like to suggest that that sentence be completely deleted from the bill and the remainder stay in there, which says that the Board then shall disapprove any agreement *if it finds, after some experience and after reasonable notice, that it does not actually police the obligations under it.*
We think that is more reasonable and more practical.
Senator Engle. I agree with you.
*Senate Hearings on H.R. 6775, supra* note 14, at 539, 553.

50. 385 F.2d 981, 984 n.7 (D.C.Cir. 1967) (emphasis in original; citations omitted).

activities and impermissibly has substituted its own concept of policing for that of conference self-regulation. We disagree.

Petitioner's argument ignores the crucial fact that the Commission has the *statutory obligation* of ensuring that the conferences *in fact adequately police* their members. The Commission's investigations over the past decade have revealed that "existing self-policing systems [which] rely primarily upon member initiated complaints . . . have failed to confront or control major incidents of rebating in both the Atlantic and Pacific trades." [51] Faced with this abysmal performance on the part of many of the conferences, the Commission concluded that the self-policing systems, in addition to relying on complaints brought by members, must initiate investigations on their own; that to make these investigations effective the self-policing bodies must also conduct surprise audits and inspections of books, records, billings, and other documents of conference signatories; and that the conferences in addition must engage a policing entity independent of the conferences to counteract any possibility of bias which a policing body affiliated with the conferences might encounter.

Concededly these rules are more detailed than prior regulations applicable to self-policing systems; yet the conferences, through the conduct of their own members, have proven themselves in need of greater guidance from the Commission. Congress recognized that the industry was in need of greater agency supervision in the hearings and legislation of 1961; implementing the overall intent of Congress regarding regulation of the conferences is what the Commission attempted to accomplish in the regulations challenged here. Moreover under these provisions, the self-policing bodies still have discretion in conducting their investigations. The Commission has stated in its final rules that "[i]t is unnecessary, however, for all investigations to be identical in scope." [52] With the widespread failure on the part of many of the conferences to secure their members' adherence to the obligations in the conference agreements and to the Shipping Act, we find that the Commission was authorized to adopt as a general rule more detailed and comprehensive provisions concerning the type and scope of the self-policing systems that the Commission deems necessary to ensure that malpractices in the industry are curtailed.[53]

**51.** Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,757 (1978), *reprinted in* Joint Appendix (J.A.) at 729, 733. The Commission noted in its final rules that:

Some 30 settlement agreements have been reached in FMC rebating investigations since January 1, 1977. The civil penalties incurred under these agreements exceed $5,000,000. An equal number of FMC enforcement claims seeking another $5,000,000 for alleged rebating violations is currently outstanding. Still other rebating cases are being processed by the Commission's staff.

*Id.* at 42,757 n.4, J.A. at 733 n.4.

Seven of the settlement agreements covering the period between 1 April 1973 and 31 March 1978 are reproduced in the appendix to the Commission's brief. *See* Brief for Federal Maritime Commission, Appendix (Exhibits 2 through 8) (violations of §§ 16, 18(b) of the Act, 46 U.S.C. §§ 815, 817(b) (1976)). These agreements also indicate that rebating and other malpractices in the ocean shipping industry are not confined to the Atlantic and Pacific trades. *See, e. g., id.* (Exhibit 2) (settlement between Sea-Land Service and the Commission involving violations of the Shipping Act in the United

States trades with Europe, the Mediterranean, the Caribbean, and the Far East).

**52.** Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,758 (1978), *reprinted in* J.A. at 729, 737.

**53.** While not all of the ocean carriers in the United States trades may have been guilty of violating their conference agreements and the Shipping Act, that does not prevent the Commission from promulgating provisions designed to eliminate malpractices in the industry where the incidences of abuse have been sufficiently widespread to warrant general, remedial measures. *See* note 51 *supra.* Moreover those conferences whose members have not violated the Shipping Act or the conference agreements have some course of relief available: if a particular conference can make a convincing showing that the trade route served by its members has been relatively free of rebating or other conduct violative of the Shipping Act and is likely to remain so, it may obtain an exemption from the neutral body requirement. *See* 46 C.F.R. § 528.3(b)(3)(iii) (1978).

■ Also critical to the Commission's ability to fulfill its obligation to oversee the conferences' self-regulatory efforts is the need to obtain reliable information concerning the nature and performance of the self-policing systems. The self-policing reports required to be submitted to the Commission under General Order 7 have reflected poorly the actual conditions in the trades. These "bare bones self-policing reports" to a great extent have indicated only minor violations of the conference agreements, while the Commission's own investigations have uncovered "major incidents of rebating" in the ocean shipping industry.[54] In light of the paucity and inaccuracy of the conference reports, the Commission was also authorized to promulgate rules requiring the conferences to keep more detailed records of their policing activities and to submit more comprehensive reports to the Commission.

### 2. *Procedural Safeguards*

Having concluded that the rules promulgated by the Commission were within the Commission's delegated authority, we must determine whether these rules were accompanied by the appropriate procedural safeguards. Petitioner first contends that the Commission's notice of proposed rulemaking in Docket No. 73–64, issued on 17 October 1973, failed to provide interested parties a reasonable opportunity to offer comments and criticisms on the reporting and record-keeping requirements set forth in sections 528.5 and 528.3(f), respectively, claiming that the published notice failed to inform

interested parties of the eventual scope of these regulations.[55] We reject petitioner's argument as completely inconsistent with the nature of the notice required under section 4(b) of the Administrative Procedure Act (APA).[56]

■ Section 4(b) provides that rulemaking must be preceded by published notice of "(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." [57] Notice need not contain every precise proposal which the agency ultimately may adopt as a rule. Rather notice is sufficient if the description of the "subjects and issues involved" affords interested parties a reasonable opportunity to participate in the rulemaking.[58]

■ Section 528.5 of the Commission's rules requires the self-policing bodies to submit semi-annual reports to the Commission disclosing that entity's self-policing and adjudicatory activities covering a six-month period including a thorough summary of the nature and scope of each investigation, a detailed description of the breaches detected, and a description of the final disposition of the case including any penalties assessed. That section also details what precise information must be included with respect to each category.[59] In the notice of proposed rulemaking issued on 17 October 1973, the Commission noticed its intent to amend the general reporting provisions set forth in General Order 7 to require the conferences to submit semi-annual reports showing the nature and basis of each investigation ini-

---

**54.** Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,757 & n.4 (1978), *reprinted in* J.A. at 729, 733 & n.4. *See, e. g.,* Brief for the Federal Maritime Commission at 53–54.

**55.** Petitioner does not challenge the notice and opportunity to comment that the Commission afforded interested parties on the other rules dealt with in this part of the opinion. We are satisfied that with respect to those provisions the Commission has met its obligation under section 4(b) of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1976).

**56.** Administrative Procedure Act § 4(b), 5 U.S.C. § 553(b) (1976).

**57.** Administrative Procedure Act § 4(b)(3), 5 U.S.C. § 553(b)(3) (1976).

**58.** *See, e. g., Forester v. Consumer Prod. Safety Comm'n,* 559 F.2d 774, 787 (D.C.Cir.1977); *Ethyl Corp. v. EPA,* 541 F.2d 1, 48 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *California Citizens Band Ass'n v. United States,* 375 F.2d 43, 48 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

**59.** 46 C.F.R. § 528.5 (1978).

tiated during the preceding six-month period, the status or findings with respect to each investigation, and a specific description of the offense and the exact amount of the penalty imposed for each violation.[60] The rule as originally proposed thus differed in no material respect from the rule eventually adopted in section 528.5. Section 528.5 merely enumerates more specifically the type of information which the Commission seeks, but interested persons were on notice that a requirement of more detailed reports than those submitted to the Commission under General Order 7 was under consideration. No error may be attributed to the fact that the notice of proposed rulemaking dealt with the reporting requirements in a more general way than section 528.5. Interested parties clearly were informed of the "subjects and issues involved" and were permitted ample opportunity to comment on those issues.

■ With respect to the recordkeeping requirements, section 528.3(f) of the Commission's rules requires the policing authority to compile and retain for at least five years a sufficient record of complaints received, investigatory action taken with respect to each complaint, copies of evidence received, and the reasons for the final disposition of each investigation.[61] In the notice of proposed rulemaking issued in Docket No. 73–64, no provision exactly comparable to section 528.3(f) was included. The reporting provisions noticed in the proposed rules, however, required that the same information, which rule 528.3(f) directs the policing authorities to maintain, be submitted to the Commission in semi-annual reports.[62] Inherent in those reporting proposals, obviously, was the requirement that some type of records of the self-policing authority's adjudicatory and investigatory activities be maintained. While the proposal that such information be maintained for

the specific period of five years first was included in rule 528.3(f), that requirement did not materially alter the nature of the "subjects and issues involved." We find that interested parties sufficiently were apprised of those issues to permit them reasonable opportunity to participate in the deliberative process.

After all, if we were to say that regulatory agencies could only promulgate the exact rules noticed originally, we would compel the agencies to choose between (1) ignoring all comments and all that the agency might learn from interested parties to improve the proposed rules, or (2) engaging in an interminable step-by-step process of a new notice and comment on rules only slightly changed from the original proposals. The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency.

■ Having determined that the Commission afforded interested parties sufficient opportunity to comment on these rules, we next must consider whether the Commission complied with section 4(c) of the APA, which requires an agency to incorporate in rules that it adopts "a concise general statement of their basis and purpose."[63] Trans-Pacific challenges the adequacy of the Commission's reasons for adopting section 528.3(b), the neutral body requirement.[64] We find this contention to be without substance and hold that the Commission fully satisfied the requirement set forth in section 4(c) of the APA.

The point of the "basis and purpose" statement required under section 4(c) is to enable the courts to determine whether the agency's rules were framed in an arbitrary or capricious manner. While the statement must be sufficiently detailed to allow a searching judicial scrutiny of the reasons

---

**60.** 38 Fed.Reg. 28,841, 28,843 (1973) (section 528.4), *reprinted in* J.A. at 10, 20–21.

**61.** 46 C.F.R. § 528.3(f) (1978).

**62.** *See* 38 Fed.Reg. 28,841, 28,843 (1973) (section 528.4), *reprinted in* J.A. at 10, 20–21; note 60 *supra* and accompanying text.

**63.** Administrative Procedure Act § 4(c), 5 U.S.C. § 553(c) (1976).

**64.** Trans-Pacific makes no claim that the Commission failed to provide a concise statement of its reasons for adopting the other rules discussed in this part of the opinion.

for adopting the rules, courts consistently have taken a commonsense approach in interpreting this requirement. Thus "[w]here [the] regulations turn crucially on factual issues, we will demand sufficient attention to these in the statement to allow the fundamental rationality of the regulations to be ascertained." [65] By contrast, however, where the judgment necessarily is more speculative, turning on "choices of policy, on an assessment of risks, or on predictions . . ., we will demand adequate reasons and explanations, but not 'findings' of the sort familiar from the world of adjudication." [66]

The overriding justification advanced for the Commission's decision to adopt the rules in question was "over ten years of experience in reviewing bare bones self-policing reports," which clearly indicated to the Commission on the basis of its own investigations "that existing self-policing systems . . . have failed to confront or control major incidents of rebating" in the ocean shipping industry.[67] Concerning the requirement of an independent self-policing entity in particular, the Commission stated that conference officials were overworked and understaffed and that this combination contribut-ed to the utter failure of the conferences to fulfill their policing obligations.[68] The Commission concluded that an independent policing body, employed by the conferences, would not experience these difficulties of divided responsibilities and, in addition, would encounter little chance of bias in implementing its policing functions.[69] While the Commission presented no specific evidence that conference officials were overworked or understaffed and thus unable to devote sufficient effort to their policing obligations, we do not believe, as Trans-Pacific argues, that such evidence was necessary. The fact remains that many of the conference officials, for whatever reason, have failed to implement their policing responsibilities, and the Commission was permitted to act on that fact. Determination of what actual modifications in the self-policing systems were necessary to remedy this pervasive problem, involving questions of policy and predictions as to probable effect, did not require strict factual findings by the Commission. We conclude that the Commission has supplied adequate reasons and explanations for its action to permit this court to review the underlying rationality of the rules.

---

65. *Amoco Oil Co. v. EPA*, 501 F.2d 722, 740–41 (D.C.Cir. 1974), *quoted in Ethyl Corp. v. EPA*, 541 F.2d 1, 23 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

66. *Ethyl Corp. v. EPA*, 541 F.2d 1, 23 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (quoting *Amoco Oil Co. v. EPA*, 501 F.2d 722, 741 (D.C.Cir. 1974)). *See City of Chicago v. FPC*, 458 F.2d 731, 744 (D.C.Cir. 1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968).

67. Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,757, *reprinted in* J.A. at 729, 733. Although Trans-Pacific makes the claim that the Commission should have detailed the "*major incidents of rebating*" in its notices of proposed rulemaking and orders, petitioner does not appear to challenge the Commission's findings, *see id.* at 42,757 n.4, J.A. at 733 n.4, nor can it seriously seek to do so. *See* Brief for the Federal Maritime Commission, Appendix (Exhibits 2 through 8) (listing settlement agreements between the Commission and various ocean carriers for rebating and other violations of the Shipping Act); note 51 *supra*

and accompanying text. Moreover, the Commission avers that it

> has now entered into settlement agreements (9), or has outstanding administrative claims for civil penalties (5), against 14 of the 18 carriers who were listed on September 1, 1977 as members of the Trans-Pacific conference. Although these settlement agreements were entered into after the notices of proposed rulemaking in Dockets 73–5 and 76–4 were issued, they recite the occurrence of numerous rebating incidents in violation of the Shipping Act during the period from 1972 through 1978.

Brief for the Federal Maritime Commission at 53–54.

68. *See* Notice of Proposed Rulemaking (Docket No. 73–64), 83 Fed.Reg. 28,841, 28,842 (1973), *reprinted in* J.A. at 10, 14; Final Rules (April rules), 43 Fed.Reg. 18,175, 18,176 (1978), *reprinted in* J.A. at 229, 234–36; Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,757–58 (1978), *reprinted in* J.A. at 729, 733.

69. *See, e. g.,* Final Rules (April rules), 43 Fed. Reg. 18,175, 18,176 (1978), *reprinted in* J.A. at 229, 235.

### 3. Standard of Review

 Under the arbitrary and capricious standard,[70] our scope of review is a narrow one.[71] After satisfying ourselves that the agency has acted within its statutory authority and that this action was accompanied by the appropriate procedural protections and was supported by sufficient evidence, we must inquire whether the rationale of the agency is both discernible and defensible.[72] In undertaking this inquiry, we may not substitute our judgment for that of the Commission, but may only assure ourselves that the agency decision was rational and based on a consideration of the relevant factors.[73]

 The record here indicates that over the last decade the existing self-policing systems have failed to detect, report, or control significant and widespread violations of the Shipping Act and the conference agreements in direct contravention of the conferences' obligation under section 15 of the Act. Under these circumstances, we discern a rational connection between the objective of ensuring that the conferences hereafter police their members adequately and the means employed—more detailed recordkeeping and reporting responsibilities to keep the Commission abreast of actual conditions in the trades, the grant of broader investigatory powers to the self-policing authorities to enhance their ability to detect breaches by the conference members, and the requirement of a neutral body policing authority with neither the problem of divided responsibilities nor of divided loyalties.[74] To make clear that the latter requirement is tailored to the purpose of curtailing malpractices, the Commission has provided an exemption from the neutral body provision on a convincing showing by a conference that the trade route served by its members has been relatively free of rebating or other conduct violative of the Shipping Act, over the past five years, and that it is likely to remain so.[75] We therefore hold that the Commission was justified in its conclusion that "independent self-policing bodies with broad investigatory powers and more de-

70. *See* Administrative Procedure Act § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (1976).

71. *See, e. g., Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).

72. In *National Ass'n of Recycling Indus., Inc. v. ICC (NARI II)*, 627 F.2d 1328, 1334 (D.C.Cir. 80), we phrased the usual inquiries concerning the action of an agency as follows:

First, did the Agency act within its statutory authority? Second, was there procedural due process, *i. e.*, notice, followed by appropriate opportunity either to comment or to participate in a hearing? Third, is there evidence (substantial evidence in the case of adjudication) to support the Agency's action? Fourth, is the rationale of the Agency both discernible and defensible? If the answer to any of these is in the negative, then the Agency action must be vacated as either beyond its authority or arbitrary and capricious under Title 5, sections 553 and 706.

*Id.* (footnote omitted).

73. *See, e. g., Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Ethyl Corp. v. EPA*, 541 F.2d 1, 33–36 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Mobil Oil Corp. v. FPC*, 469 F.2d 130, 140 (D.C.Cir.1972), *cert. denied*, 412 U.S.

931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973); *City of Chicago v. FPC*, 458 F.2d 731, 744–45 (D.C. Cir.1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

74. If a particular conference can make a convincing showing that "[t]he persons conducting self-policing activities are qualified and their self-policing activities would not substantially conflict with their other duties and responsibilities," it may obtain an exemption from the neutral body requirement. 46 C.F.R. § 528.-3(b)(3)(i) (1978).

75. *Id.* § 528.3(b)(3)(iii). In addition, contrary to Trans-Pacific's contention, the Commission considered the objection raised to the neutral body requirement that such a provision would impose a severe economic burden on smaller conferences. The Commission adopted an exemption to the rule for conferences which can demonstrate that the requirement would impose an undue economic burden on the conference members. Section 528.3(b)(3)(ii) provides that petitions for exemption must include a convincing showing that:

(ii) The agreement is so limited in scope that the retention of an independent self-policing authority would impose an unrealistic financial burden on the members. The number of members, the financial condition of the

tailed reporting responsibilities are necessary features of adequate self-policing—as a general rule." [76]

■ Concerning the requirement of an "impartial adjudicator," this court has held that the self-policing systems used by the conferences must afford accused members "fair treatment." [77] As a result of the broad investigatory and adjudicatory powers that the self-policing systems wield over the conference signatories, "fair treatment" demands some form of continuing, internal review.[78] The Commission therefore was permitted to find that as a minimum the self-policing bodies must guarantee accused members the right to appeal before an "impartial adjudicator," who "shall be vested with final authority to adjudicate disputes and assess damages within the scope of the self-policing system." [79]

### B. *Denial of Access to Documents Provision*

■ Also included within the Commission's rules is section 528.1(c), which prohib-

its the conferences from inserting any provision in the conference agreements that would deny the Commission access to copies of self-policing records, statistics, reports, or other documents.[80] Section 528.1(c) is designed both to facilitate the Commission's statutory obligation to ensure that conferences are policing their members adequately as well as to aid the Commission in its "wider responsibility to fairly and effectively enforce the Shipping Act." [81]

Both petitioners Sea-Land and Trans-Pacific challenge section 528.1(c) on the substantive grounds that the legislative history of the 1961 amendments indicates that Congress deliberately withheld from the Commission the authority to obtain access to self-policing records located abroad as a precondition to section 15 approval of the rate fixing agreements. In addition petitioners argue that the Commission's intention to use self-policing data in aid of its enforcement responsibilities improperly will interject the Commission into the day-to-

---

members, the nature and extent of the trade, the competitive circumstances prevailing in the trade, and other activities of the members both within and without the trade (*e. g.*, participation in other agreements) are all relevant considerations[.]
*Id.* § 528.3(b)(3)(ii).

76. Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,758 (1978), *reprinted in* J.A. at 729, 733.

77. *See States Marine Lines, Inc. v. FMC,* 376 F.2d 230, 234–42 (D.C.Cir.1967).

78. *See also id.* at 242.

79. 46 C.F.R. § 528.4(b) (1978).

80. Section 528.1(c) provides in its entirety:
(c) No self-policing system shall contain provisions which purport to:
(1) Deny access to or copies of any self-policing records, statistics, reports, or other information (including the identity of members) in contravention of a duly issued order of the Federal Maritime Commission (or a Commission employee with delegated authority to issue such orders); or
(2) Preclude any of its members from disclosing the nature and extent of their own involvement with the self-policing authority (e. g., any damages paid by the member) in any administrative or judicial proceeding to enforce the Shipping Act.

*Id.* § 528.1(c).

81. Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,759 (1978) (citation omitted), *reprinted in* J.A. at 729, 742.

In its final rules, the Commission referred specifically to sections 14, 16, 18(b) of the Shipping Act, 46 U.S.C. §§ 812, 815, 817(b) (1976). Sections 14, 16 prohibit, *inter alia,* ocean common carriers from paying rebates to shippers, granting any undue or unreasonable preferences, advantages, to any traffic, and discriminating through use of various unfair practices against any shipper. Any carrier who violates these sections shall be guilty of a misdemeanor punishable by fine. Section 18(b) prohibits, *inter alia,* ocean carriers from charging or collecting any rate or charge deviating from those tariffs required to be filed with the Commission. Whoever violates this section shall be subject to civil penalties,

One Commissioner dissented from the announced intention of the Commission to use section 528.1(c) in aid of its enforcement responsibilities, but agreed that the Commission should have access to self-policing data as part of its surveillance responsibility over the adequacy of the conferences' self-policing efforts. *See* Dissenting Op. (24 Oct. 1978), *reprinted in* J.A. at 780, 788–89.

day operations of the conference policing systems, contrary to congressional intent that conferences engage in self-regulation. Petitioners also claim that the Commission's use of section 528.1(c) as a means of implementing its enforcement obligations may well cause a breakup of the conference system. Petitioners predict that carriers, to avoid the threat of sanctions from both the self-policing entity and the Commission, may withdraw from the conferences rather than submit confidential documents to the policing authorities if those documents then may be obtained by the Commission.

We are aware, of course, that Congress declined to grant the Commission the power to obtain access to self-policing records wherever located as a precondition to section 15 endorsement of the rate fixing agreements, but we perceive no inconsistency between the legislative history of the 1961 amendments and section 528.1(c). Given the context of this case, we also think that petitioners' other concerns as to the potential implications and effects of the rule are raised prematurely. For reasons to be discussed, we hold that the Commission's promulgation of section 528.1(c) was a proper exercise of its authority under the Act.

1. *Substantive Challenges to Section 528.1(c)*

In its bill to amend the Shipping Act, the House included the following addition to section 15:

No [conference] agreement shall be approved unless it shall (1) designate a person upon whom service of process may be made within the United States which will

be effective against every signatory to such agreement, and (2) contains provisions that every signatory shall provide records or other information, wherever located, required by any [proper] order of the [Commission].[82]

Thus the House provision would have required the conferences expressly to include in their agreements a provision that would permit the Commission access to self-policing records and documents, wherever located, as a condition to obtaining the Commission's approval of these agreements under section 15.

Opposition to the access provision was intense and widespread. During the extensive hearings held before the House and Senate subcommittees, representatives of several foreign maritime nations, carriers under these foreign flags, as well as a number of American-flag carriers, made known their objections to the provision.[83] The foreign maritime nations resented what they perceived to be an attempt by the United States to regulate unilaterally an entire international industry. Considering the House provision a direct infringement on their sovereignties, several of these governments lodged protests with the State Department, indicating in the strongest possible language that these nations would rather the conferences dissolve than permit their nationals to comply with requests for production of documents by the Commission.[84] Many of the American-flag carriers—anxious to retain the conference system which if adhered to would set rates higher than would otherwise prevail in the market and thus enable them to compete more effectively against the low-cost for-

**82.** *See* H.R.Rep.No.498, 87th Cong., 1st Sess. 40 (1961) (H.R. 6775). The House also included a similar provision to amend section 21 of the Act, 46 U.S.C. § 820, which applies to ocean common carriers serving the foreign commerce of the United States. *See* H.R.Rep.No.498, 87th Cong., 1st Sess. 44 (1961). The Senate deleted this provision, *see* S.Rep.No.860, 87th Cong., 1st Sess. 44 (1961), but made no move to amend that section to withdraw from the Commission the authority to obtain documents located abroad, which two courts had already found to exist. *See* note 89 *infra* and accompanying text.

**83.** *See, e. g., Senate Hearings on H.R. 6775, supra* note 14, at 10, 48–50, 52–70, 79–81, 103–04, 155, 253, 462–64, 539–45, 646–47, 654, 682–83, 686, 706–07; *Hearings on H.R. 4299 Before the Special Subcomm. on Steamship Conferences of the House Comm. on Merchant Marine and Fisheries,* 87th Cong., 1st Sess. 134–35, 140–44 (1961) [hereinafter cited as *House Hearings on H.R. 4229*].

**84.** *See, e. g.,* S.Rep.No.860, 87th Cong., 1st Sess. 3, 25; 107 Cong.Rec. 19,304, 19,305–07 (1961) (Senate debate on H.R. 6775).

eign carriers—also resisted the access proposal.[85] Thus beset with severe doubts concerning both the continued existence of the conference system if the access proposal were enacted as well as the feasibility of enforcing such a proposal in view of strong foreign opposition, the Senate Committee deleted the provision from the House bill that eventually was passed by Congress.[86]

At the same time that the Senate was considering the House proposal, however, it also was aware of two circuit court decisions, one of which was written by this court, that had interpreted section 21 of the Shipping Act to allow the Commission to compel ocean common carriers subject to the Act to produce documents located outside the territorial confines of the United States.[87] Although section 21 contained no express authorization to the Commission to require the production of documents located

abroad, these courts found that such power should be implied in light of the scope and purpose of the Act. Reasoning that Congress intended to subject both American and foreign-flag carriers to regulation under the Shipping Act, the courts concluded that imposing a territorial limitation on the Commission's investigatory powers under section 21 impermissibly would impede the Commission's regulatory responsibilities.[88]

Under these decisions, then, the Commission was found to possess the power, pursuant to section 21 of the Act, to obtain documents located outside the territorial confines of the United States. Congress clearly was unwilling to invest the Commission, under section 15 of the Act, with similar power; yet, it also made no move to amend section 21 to withdraw from the Commission the authority that the courts had found to inhere in that section.[89] Thus

---

**85.** *See, e. g., Senate Hearings on H.R. 6775, supra* note 14, at 102–05. *But see id.* at 517–18; *House Hearings on H.R. 4229, supra* note 83, at 370–71 (statements of representative for independent American-flag carrier). Testimony before the House and Senate predicted that if a breakup of the conference systems were to occur, the high-cost American-flag ships—even though buoyed by operating and construction-differential subsidies, *see, e. g.,* note 12 *supra* and accompanying text—would be unable to compete with the foreign carriers. *See, e. g., House Hearings on H.R. 4229, supra* note 83, at 23, 42–43 (statement of Chairman of FMB); 107 Cong.Rec. 19,304, 19,306 (1961) (Senate debate on H.R. 6775); S.Rep.No.860, 87th Cong., 1st Sess. 3 (1961).

**86.** In striking the House proposal, the Senate commented:

Your committee deleted from the bill a provision which would have amended section 15, Shipping Act, 1916, to require that all agreements approved under that section (1) designate an agent in the United States for the receipt of process effective against the signatories to the agreement; and (2) provide that every such signatory shall furnish the Commission "records or other information," wherever located in compliance with Commission orders. This provision was so vigorously opposed, and for good reasons, by practically all interested parties except the Federal Maritime Board, that we deleted it. S.Rep.No.860, 87th Cong., 1st Sess. 17 (1961), U.S.Code Cong. & Admin.News 1961, p. 3124.

**87.** *See Montship Lines, Ltd. v. Federal Maritime Bd.,* 295 F.2d 147 (D.C.Cir. 1961); *Kerr*

*Steamship Co. v. United States,* 284 F.2d 61 (2d Cir. 1960), *vacated on other grounds,* 369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962). Section 21 provides in relevant part:

The [Commission] may require any common carrier by water, or other persons subject to this Act, or any officer, receiver, trustee, lessee, agent, or employee thereof, to file with it ... any periodical or special report, or any account, record, rate, or charge, or any memorandum of any facts and transactions pertaining to the business of such carrier or other person subject to this Act.
46 U.S.C. § 820 (1976).

**88.** *See Montship Lines, Ltd. v. Federal Maritime Bd.,* 295 F.2d 147, 153–154 (D.C.Cir. 1961); *Kerr Steamship Co. v. United States,* 284 F.2d 61, 63–64 (2d Cir. 1960), *vacated on other grounds,* 369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962).

**89.** Referring to the two appellate decisions in its committee report, the Senate stated:

To date two U.S. courts of appeal have held that under the present section 21, Shipping Act, 1916, the Commission may lawfully order foreign flag ocean common carriers serving U.S. ports, inbound or outbound, to furnish documents in compliance with lawful section 21 orders, even though the documents are located in foreign countries. How the United States will be able to enforce such orders in the face of directives not to produce from five friendly maritime nations (Belgium, Italy, Japan, the Netherlands, and the United Kingdom) is a question of great foreign poli-

while Congress declined to place an additional investigatory tool at the Commission's disposal under section 15 of the Act, it also did not disaffirm or disturb any of the Commission's existing investigatory techniques.

██ We perceive no incompatibility between the legislative history of the 1961 amendments and section 528.1(c). Contrary to petitioners' construction of the rule, it does not require the self-policing entities affirmatively to place self-policing records at the Commission's disposal as a condition to Commission approval of the conference agreements—such a requirement clearly would run contrary to the legislative history of the 1961 amendments.[90] Instead, section 528.1(c) provides only that the conferences may not include in their agreements any provision that automatically would preclude the Commission, through whatever tools it may have, from obtaining self-policing records and documents.

In other words, we interpret the rule to mean that the conference agreements may not prohibit the members or the self-policing entities from making self-policing information available to the Commission, whether this information is submitted voluntarily or otherwise obtained by the Commission through whatever leverage the Commission may be able to exert. The rule on its face does not purport to authorize broader access by the Commission to documents than· is already recognized under existing law; nor does it purport to preclude the conferences from raising any valid defense to an order to produce in the event the Commission requests self-policing records.

In short, the rule only prevents the conferences from agreeing in advance that they will not allow the Commission access to self-policing records and documents. And nothing in the legislative history of the 1961 amendments requires the Commission to approve conference agreements that erect insurmountable obstacles to any attempt on the part of the Commission to obtain self-policing information.

To deprive the Commission of any opportunity to gain access to this type of information would be inconsistent with the Commission's recognized regulatory responsibilities. Confronted with over two hundred violations of the rate fixing agreements and of the Shipping Act uncovered by the Celler Committee in a relatively short period, one of Congress's primary objectives in enacting the 1961 amendments was the elimination of malpractices in the industry.[91] To that end, Congress bolstered the Commission's responsibilities under section 15, assigning to the Commission the task of assuring that the conferences police their members adequately. In addition to its supervisory responsibilities, the Commission has the statutory obligation of enforcing the Shipping Act, including, for example, those provisions which prohibit ocean common carriers from granting to shippers rebates or unreasonable preferences or advantages to secure

cy importance. Certainly, we would only muddy the waters and do violence to our foreign policy were we to leave such provisions in the bill. Furthermore, we are convinced that if we did so a number of steamship conferences would have to dissolve since a number of foreign lines would be compelled by their governments to withdraw, rather than submit to the receipt-of-process and document-production pledge required by the language of the bill.
S.Rep.No.860, 87th Cong., 1st Sess. 25 (1961), U.S.Code Cong. & Admin.News 1961, p. 3132.

**90.** In the notice of proposed rulemaking in Docket No. 73–5 (issued on 23 February 1977), the Commission included a provision that would have required the conferences and rate agreements to maintain copies of all self-policing records in the United States, available for the Commission's inspection. *See* 38 Fed.Reg. 4982, 4984, 4987–88 (1973). When the Commission instituted another rulemaking proceeding in Docket No. 73–64 to consider the issues related to the self-policing systems, it also included a similar access-to-records proposal. *See id.* at 28,841, 28,842 (section 528.2), *reprinted in* J.A. at 10, 17. In response to vigorous industry opposition, the Commission deleted the access provision when it promulgated its April rules.

**91.** *See, e. g.,* notes 16–20 *supra* and accompanying text.

the business of a shipper.[92] Although Congress did not resolve precisely the relation between the Commission's obligation to enforce the Shipping Act and the conferences' duty to regulate their members,[93] Congress made it clear that the self-policing clause would not subtract in any way from the powers, duties, and responsibilities of the Commission.[94] The 1961 amendments thus expanded the Commission's supervisory responsibilities and left its enforcement responsibilities firmly intact. To provide the Commission with the means of implementing these substantive responsibilities, Congress also broadened considerably the Commission's rulemaking powers.[95]

Diligent performance of the Commission's duties to monitor the conferences' policing attempts and to enforce the Shipping Act demands that the Commission keep itself informed of actual occurrences and practices in the ocean shipping industry. If the conferences, through their agreements, could block in advance any Commission attempt to gain access to self-policing documents, the Commission's ability to obtain reliable information concerning conditions in the trades severely would be restricted and, as an obvious corollary, the Commission's ability to perform its regulatory responsibilities would be impaired severely. Section 528.1(c) is a legitimate effort on the part of the Commission to prevent this from occurring.

In view of the limited scope of the rule and the posture of this case, we also find petitioners' other objections to the rule to be unfounded. Petitioners contend section 528.1(c) should be struck as imposing a potential requirement that may be enforced easily against the American-flag lines, but, in view of uncooperative foreign governments and their nationals, not against their relatively unreachable foreign competitors. Specifically, petitioners claim that not only will member lines be unwilling to cooperate with policing authorities' requests for production of documents if those documents then may be obtained by the Commission, but that foreign governments will also prohibit their nationals from disclosing such confidential business records.

Although we have held in *Alcoa Steamship Co. v. Federal Maritime Commission*[96] that the Commission, consistent with the policy of promoting an American merchant fleet, may not adopt regulations that would place an unequal burden on American-flag carriers in relation to their foreign-flag competitors,[97] section 528.1(c) on its

**92.** *See* Shipping Act §§ 14, 16, 46 U.S.C. §§ 812, 815 (1976); note 81 *supra*. We note that we discern nothing in the legislative history of the 1961 amendments to the Shipping Act that would require a strict bifurcation of the Commission's supervisory and enforcement obligations, and petitioners do not contend otherwise. *See also Montship Lines, Ltd. v. Federal Maritime Bd.*, 295 F.2d 147, 153 (D.C.Cir. 1961) (no basis in Shipping Act for bifurcation of Commission's enforcement and supervisory functions under section 21 of the Act, 46 U.S.C. § 820).

**93.** The practical effect of imposing on the conferences the self-policing mandate in the 1961 amendments was to give the conferences concurrent responsibility with the Commission for enforcing the Act. How that responsibility was to be shared emerged as an issue of considerable concern in the hearings before the Senate and House Subcommittees on the 1961 amendments. Industry representatives strongly objected to any attempt to use policing bodies as auxiliary investigatory arms of the Commission. Their principal concern underlying this objection was the threat of being penalized for

violations of the Shipping Act and rate fixing agreements by both the self-policing body and the Commission for the same conduct. *See, e. g., Senate Hearings on H.R. 6775, supra* note 14, at 646–47, 654, 682–83, 686, 706–07.

**94.** *See, e. g.,* H.R.Rep.No.498, 87th Cong., 1st Sess. 10–11 (1961); note 21 *supra* and accompanying text. Thus, we reject petitioners' contention, as inconsistent with the Commission's recognized obligations under the Shipping Act, that the Commission's use of data acquired from the policing authorities will interject the Commission into the monitoring activities of those bodies and as a consequence frustrate congressional intent that the conferences engage in self-regulation.

**95.** *See, e. g.,* note 23 *supra* and accompanying text.

**96.** 348 F.2d 756 (D.C.Cir. 1965).

**97.** *Id.* at 761. We also note that in *Alcoa Steamship Co.*, this court stated that the legislative history confirmed our decision in *Mont-*

face does not run afoul of this substantive limitation on the Commission's powers. To reiterate, section 528.1(c) only prevents the conferences from inserting in their agreements any provision that would prevent the Commission from obtaining access to self-policing records or documents; no order for the production of documents is even remotely at issue in this case.[98] The assertion that American-flag lines will bear unequally the burden of section 528.1(c) is purely conjectural in the context of this case and, as such, is not an issue appropriately considered by this court.

Our response to petitioners' next objection is similar. Trans-Pacific and Sea-Land claim that if the Commission uses documents acquired from the self-policing entities to discharge its enforcement obligations, the carriers will be subject to penalties from both the conference policing body and the Commission for the same conduct or transaction. As a result, petitioners predict that, to avoid the threat of double sanctions, carriers will withdraw en masse from the conference. Again, petitioners' argument rests solely on speculation: no order for the production of documents is at issue in this case.

We note, moreover, that in the event the Commission does seek to acquire self-policing records and documents, the Commission—to dispel just this concern over double penalties—has stated in its final rules that it would "afford significant weight to any self-policing damages paid by a carrier when the same conduct of that carrier becomes the object of an FMC civil penalty claim. As a minimum, credit shall be given for damages paid under a self-policing system."[99] Finding petitioners' contentions unavailing, we are persuaded that the promulgation of section 528.1(c) was a proper exercise of the Commission's rulemaking authority under the Shipping Act.[100]

2. *Procedural Challenges to Section 528.1(c)*

■ Having disposed of the substantive objections to the Commission's promulgation of section 528.1(c), we must consider petitioners' argument that the Commission's rulemaking proceedings failed to afford interested parties the opportunity to make informed comments and criticisms on that section.[101] Petitioners' criticism turns on the fact that the Commission deleted a provision from the April "Final Rules," which would have required the self-policing

ship Lines, Ltd. v. Federal Maritime Bd., 295 F.2d 147, 153 (D.C.Cir. 1961), which interpreted section 21 of the Act to require ocean common carriers to produce documents located outside the territorial confines of the United States—despite objections raised in *Montship* that such requests would be unenforceable. *See Alcoa Steamship Co. v. FMC*, 348 F.2d at 761 n.28.

**98.** Thus we reject petitioner Trans-Pacific's claim that section 528.1(c) violates the fourth amendment protection against unreasonable searches and seizures. The short answer to petitioner's objection is that the present case presents no question of an actual search and seizure; it raises only the question of the validity of the Commission's exercise of its rulemaking powers. *See, e. g., Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 195, 208, 66 S.Ct. 494, 498, 505, 90 L.Ed. 614 (1946).

**99.** Reconsideration and Modification of Final Rules, 43 Fed.Reg. 42,757, 42,759 (1978), *reprinted in* J.A. at 729, 742–43. The Commission also stated: "In the case of isolated, less serious Shipping Act violations, no civil penalty claim shall be pursued when the carrier has cooperated fully with the Commission and rea-

sonable self-policing penalties have been paid." *Id.*, J.A. at 743.

**100.** Section 528.1(c) seems a particularly prudent exercise of the Commission's rulemaking powers in view of the current conditions in the industry. Despite congressional insistence on adequate policing, the awarding of secret rebates to shippers in violation of agreed-upon rate schedules has remained a chronic problem, and the conferences' efforts to curb these violations have been largely ineffectual. *See, e. g.,* notes 51–53 *supra* and accompanying text. Moreover, the reports submitted by the self-policing bodies to the Commission under former General Order 7 have indicated not at all the true state of the industry. *See id.*

**101.** We have also given due consideration to petitioner Trans-Pacific's bald assertion that the Commission in adopting its final rules failed to follow its procedures adopted pursuant to the Government in Sunshine Act, 5 U.S.C. § 552b (1976), *see* 46 C.F.R. § 503.70 (1978). We find this contention to be without substance.

systems to provide the Commission upon request with copies of self-policing records [102] and then promulgated its actual final rules on 14 September 1978, which included section 528.1(c). Sea-Land and Trans-Pacific argue that because an access-to-records provision was deleted from the April rules, under section 4(b)(3) of the APA [103] the Commission was precluded from adopting section 528.1(c), a similar provision cast in negative terms, without affording interested parties an additional opportunity for notice and comment. We disagree.

Briefly recalling the sequence of events leading to the Commission's promulgation of its September rules, the Commission issued a notice of proposed rulemaking on 23 February 1973 (Docket No. 73–5) to revise regulations dealing generally with section 15 agreements and to amend the regulations pertaining particularly to the conference self-policing systems.[104] That notice included a provision that would have required the conferences and rate agreements to maintain copies of all records of self-policing activities, which then would be available for the Commission's inspection, in the United States. The proposed rule also required that the identity of parties found to have violated a rate agreement be disclosed to the Commission following the final disposition of a disciplinary proceeding conducted by the self-policing authority.[105]

On 17 October 1973 the Commission instituted another rulemaking proceeding (Docket No. 73–64) to consider separately the issues related to the self-policing systems.[106] These proposed rules also included a provision that would have required every self-policing system to furnish the Commission upon request with a copy of all self-policing records. Although the access proposal was amended to permit the self-policing

bodies to delete the names of the parties involved in the investigation and adjudicatory proceedings,[107] the Commission substituted a requirement of an identifying code for each conference member.[108]

Public comments were solicited and received including comments from petitioners. Hearing counsel for the Commission responded to these comments, and eight more sets of comments were filed on behalf of the conferences and rate agreements. On 18 April 1978 the Commission promulgated its April rules, and in response to industry opposition, deleted the access-to-records provision. Nineteen petitions for reconsideration of the April rules were filed. On 14 September 1978 the Commission, without allowing additional notice and opportunity for comment, adopted the final rules which included the provision at issue, section 528.-1(c).

While petitioners were not provided additional notice and opportunity to comment on section 528.1(c) prior to its adoption, we believe that interested parties were afforded sufficient opportunity to make informed criticisms on all conceivable issues raised by the rule during the course of the rulemaking. Petitioners were twice on notice that the Commission was contemplating the adoption of an access-to-records provision: both the notices of proposed rulemaking in Docket Nos. 73–5 and 73–64, an outgrowth of the prior proceeding, contained this requirement. This requirement was cast in the affirmative; whereas section 528.1(c) is cast in negative terms, prohibiting the conferences from inserting in the conference agreements any provision that would deny the Commission access to copies of self-policing records. The subject matter of the two types of provisions, however, is the same—the availability to the Commission of self-policing records and documents.

---

102. *See* 38 Fed.Reg. 28,841, 28,842 (1973) (section 528.2), *reprinted in* J.A. at 10, 17.

103. Administrative Procedure Act § 4(b)(3), 5 U.S.C. § 553(b)(3) (1976).

104. 38 Fed.Reg. 4982 (1973).

105. *Id.* at 4984, 4987–88.

106. *Id.* at 28,841.

107. *Id.* at 28,842 (section 528.2), *reprinted in* J.A. at 10, 17.

108. *Id.* at 28,843 (section 528.4), *reprinted in* J.A. at 10, 20.

Taking a commonsense approach to section 4(b)(3) of the APA,[109] it is hard to conceive how petitioners may claim that they were not provided sufficient notice and opportunity to comment on all potential issues raised by section 528.1(c). Interested parties, including petitioners, availed themselves of the opportunity to comment on the access requirement initially noticed in Docket Nos. 73–5 and 73–64, assailing the proposed provisions on the same grounds that petitioners now attack section 528.-1(c).[110]

Petitioners' complaint, when examined closely, seems to be not that as a practical matter it was deprived of a meaningful opportunity to submit informed comments on section 528.1(c), but that once the Commission seemingly accepted the petitioners' arguments by deleting the access proposal from the April rules, it was precluded from thereafter changing its position. This notion misconstrues the purpose of the notice and comment requirement: it is intended to allow interested parties the chance to make informed criticisms, not to afford those persons with a "right" to insist that a rule take a particular form.[111] We conclude therefore that the Commission satisfied the requirements of section 4(b)(3) of the Administrative Procedure Act.

▮ Under section 4(b)(2) of the APA, an agency is also directed to include in its notice of proposed rulemaking a reference to the legal authority under which the rule is proposed.[112] Reference to the enforcement provisions of the Shipping Act, sections 14, 16, 18(b),[113] for the authority to adopt section 528.1(c), however, was first included in the Commission's publication of its final regulations. Although the Commission technically was not in compliance with section 4(b)(2), we believe that the defect in the notice of proposed rulemaking was not fatal.

The proposed rules in Docket No. 73–5 contained a requirement that the self-policing records submitted to the Commission disclose the identity of carriers found to have violated a rate agreement. In Docket No. 73–64 the Commission amended the access proposal to allow the self-policing bodies to delete the names of the parties involved in any disciplinary proceeding; however, the Commission substituted a requirement of a coded identification for each of the conference members.[114] Many of the comments received by the Commission in Docket No. 73–64 were directed to the concern that the Commission could use self-policing data acquired under an access proposal to discharge not only its supervisory functions under section 15 of the Shipping Act, but its enforcement obligations as well.[115] Thus, prior to the publication of the final rules, interested parties availed themselves of the opportunity to comment on the relationship between an access proposal and the Commission's enforcement duties. Given the similar subject matter involved in an access proposal and section 528.1(c), we do not think petitioners were prejudiced by the Commission's failure to include specific reference to the enforcement sections of the Act until the actual promulgation of section 528.1(c).

3. *Rationality of Section 528.1(c)*

▮ Again, after concluding that the Commission acted within its statutory authority in promulgating the challenged rule and that this action was preceded by the requisite procedural safeguards and was supported by sufficient evidence, our re-

---

109. *See* notes 57–58 *supra* and accompanying text.

110. *See, e. g.,* J.A. at 29–32, 36–46, 51–56, 62, 64–65, 81–82, 84–88, 95, 98–113, 123, 138–40, 146–49, 152–54.

111. *See, e. g., Pacific Coast European Conference v. United States,* 350 F.2d 197, 205 (9th Cir.), *cert. denied,* 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965).

112. 5 U.S.C. § 553(b)(2) (1976).

113. 46 U.S.C. §§ 812, 815, 817(b) (1976).

114. *See* notes 105, 107–08 *supra* and accompanying text.

115. *See, e. g.,* J.A. at 29–32, 36–46, 52–56, 64–65, 81–82, 95, 98–113, 138–40, 146–49, 152–54.

view is limited to determining whether the agency's action was rational and based upon a consideration of the relevant factors.[116] Congress has charged the Commission with both the "well-nigh impossible task of policing certain proscribed activities, regardless of whether they occur in New York or Bombay"[117] as well as with the equally difficult task of overseeing the conferences' attempts at self-regulation covering the same global expanse. For the Commission to discharge either of these tasks with any measure of success, it must be permitted the opportunity to gain access to those records and documents—wherever located—that reflect actual occurrences and practices in the shipping industry. We hold therefore that section 528.1(c) is a rational means of implementing the Commission's dual responsibilities under the Shipping Act.

## III. CONCLUSION

Finding the challenged rules to be a proper exercise of the Commission's authority under the Shipping Act, we hold that the order is

*Affirmed.*

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals,* dissenting:

With utmost respect, I dissent. In my view, the plain language of section 15 and its legislative history establish that Congress withheld authority from the Commission to do what it has here done, that is, to prescribe in advance specific and "effec-

tive" policing systems and procedures. I cannot agree that such authority inheres in section 43 coupled with section 15, or that section 43 has always been available to implement section 15, in the manner here attempted, at the option of the Commission.

In sum, we deal here not with the more common question of whether an agency action is within its delegated authority but with one of whether the challenged action is directly contrary to congressional limitations on its authority. Little has been seen or heard in recent times of the once strong requirement for clear standards when Congress delegates its legislative authority. When Congress does meet its obligation to establish a clear standard, as it has here, a concomitant obligation to enforce that standard devolves upon the courts, whatever may be the judicial view of the wisdom or practicality of that standard.

## I. SECTION 15 AND THE CHALLENGED RULES

The self-policing provision in section 15 authorizes the Commission to disapprove a conference agreement, after notice and hearing, on a finding of inadequate policing or an absence of complaint procedures.[1] Approval is important because conference members operating under approved agreements enjoy a privileged immunity from our antitrust laws.

The challenged rules dictate, for the first time, a plethora of detailed conference agreement provisions, and pre-condition approval on the presence of those provisions.[2]

---

116. *See* notes 70–73 *supra* and accompanying text. Trans-Pacific makes the argument that the Commission failed to consider the risk that the conference system may disintegrate if the Commission is permitted to acquire self-policing data. The Commission, however, evaluated this threat against the substantial advantage that would be lost to the foreign carriers if they were to withdraw from the conferences—exemption from our antitrust laws.

Given the posture of this case, it would be inappropriate for the court at this time to undertake an evaluation of whether the Commission erred in its assessment of the probable effect of adopting section 528.1(c).

117. 107 Cong.Rec. 19,304, 19,309 (1961) (Senate debate on H.R. 6775; remarks of Sen. Butler).

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. 46 U.S.C. § 814 (1976) reads in pertinent part:
 The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.

2. 46 C.F.R. § 528 (1978).

The nature of a uniform self-policing system, and the manner of operating it, are spelled out in rigid detail.

In complying with rule 528.1(b), all conference members and parties to rate agreements must engage (and pay for) both an independent policing authority and an impartial "arbitrator." The agreement must describe the function and powers of the authority and the arbitrator. Under rule 528.1(c), no self-policing system may contain a provisión purporting to deny access to self-policing records contra an order of the Commission. Under rule 528.2, agreements must contain specified provisions on breaches, permissible damages, investigation of breaches, adjudication of breaches, procedural guarantees, and a designated official. Rules 528.3 and 528.4 set forth detailed requirements governing the nature and functions of policing authorities and impartial arbitrators, respectively. Rule 528.5 establishes elaborate reporting requirements.

Thus the challenged rules prescribe the self-policing provisions for all future conference agreements. Absent waiver (discussed below), agreements failing to meet any of the rules will be automatically disapproved.

## II. ABSENCE OF COMMISSION AUTHORITY

### A. *Adjudicatory* vs. *Rulemaking Authority*

Section 15 authorizes the Commission to disapprove an agreement, *after notice and hearing*, on a finding of inadequate policing of its obligations or an absence of procedures. That authority presupposes a factual determination in each case. It is not an authority to prescribe in advance the precise kind of policing system all must adopt and the specific, detailed manner of operating that prescribed system.

Section 15, granting adjudicatory, not rulemaking, authority, envisages individual fact situations surrounding individual agreements reviewed individually. If action under "any" agreement appears wanting, the Commission must follow a notice-and-hearing procedure before disapproving that agreement. The challenged rules would finesse the notice-and-hearing requirements for all non-conforming agreements, and would unlawfully substitute the Commission's concept of policing for that of those affected. Whether a conference was in *fact* adequately policing member obligations under an agreement would become irrelevant in any case in which the agreement lacked one of the Commission's prescribed provisions. The challenged rules thus nullify the statutory concept of *self-policing.*[3]

### B. *Rule 528.1(c)*

Rule 528.1(c) is particularly egregious:

(c) No self-policing system shall contain provisions which purport to:

(1) deny access to or copies of any self-policing records, statistics, reports, or other information (including the identi-

---

**3.** Fully conscious of the salutary injunction under which we review the authority, not the wisdom, of Commission action, I nonetheless note in passing the notion implicit in the challenged rules that all conferences present the same situation. But some conferences are large; some are small. Some are economically stable; others are not. The dollar volume of trade is many times larger in some than in others. Malpractices may abound in some and be absent from others. Conditions change. Because numerous factors distinguish the policing needs of conferences and rate agreements from one another, and because the international scope of shipping makes governmental policing impractical, Congress envisaged policing systems voluntarily adopted and tailored by the members of a given trade to fit the needs of that trade, that is, *self-policing* systems. In my view, the challenged rules eradicate the discretion and flexibility essential to effectively tailored and necessarily varied systems of self-policing.

Similarly, the Commission and the majority opinion make it clear that at least some, if not all, of the challenged rules are "good ideas," insofar as they aid the Commission in its enforcement role under the Shipping Act. As indicated, our concern is not with whether a rule is a "good" or "bad" idea, but with whether a rule is authorized. Unauthorized rules, however wise or useful or effective, can never in law be "good."

ty of members) in contravention of a duly issued order of the Federal Maritime Commission (or a Commission employee with delegated authority to issue such orders); or

(2) preclude any of its members from disclosing the nature and extent of their *own* involvement with the self-policing authority (*e. g.,* any damages paid by the member) in any administrative or judicial proceeding to enforce the Shipping Act.

As recognized in *States Marine Lines, Inc. v. Federal Maritime Commission,* 376 F.2d 230, 238 (D.C.Cir.1967), carriers, fearing retaliation, will not complain against each other unless assured of confidentiality. That the rule was converted from positive to negative terminology does not change its confidentiality-destroying effect. Hence, rule 528.1(c) can serve only to frustrate efforts to achieve effective self-policing and lead to demise of the conference scheme. If that view be considered conjecture, it is, as discussed below, a congressional conjecture, accepted and employed as a basis for limiting the Commission's authority under section 15. A concern for potential implications and effects of the rule can hardly be viewed as "premature" when that very concern formed the basis for congressional enactment of the statute.

A holding that rule 528.1(c) is beyond the authority granted the Commission under section 15 would not deprive it of opportunity to gain appropriate access to self-policing information needed to make the finding required by section 15. Such a holding would merely require the Commission to follow the statute under which it must conduct a hearing, and make a finding of inadequate policing, before it disapproves an

agreement. Prohibiting the members of a conference from including in their agreement "provisions which purport to" deny Commission access to certain information may or may not be a good idea. It may or may not be irrelevant, given the unlikelihood that such provisions could in themselves be determinative in a test of a "duly issued" Commission order. In any case, the rule is a legislative (rulemaking) prior dictation of the content, or noncontent, of a conference agreement, not the adjudicatory determination of approval/disapproval authorized by section 15. Its result is a prior disapproval of all agreements having such provisions, *without* the finding of inadequate policing, *after* notice and hearing, required by section 15.[4]

The Commission announced its intention to use information obtained under rule 528.-1(c) to base civil penalty claims on the same actions for which a neutral body has previously assessed damages.[5] The rule, and the Commission's intended action under it, bear no relation whatever to section 15. Under that section, the Commission is responsible for determining whether a particular conference is performing an adequate self-policing function. If it is not, the Commission is obliged to disapprove the underlying conference agreement. If it is, there is no basis for disapproving the agreement. In either case, the Commission's role under section 15 is at an end when it makes its finding and either approves or disapproves the agreement.

Indeed, and incongruously, the Commission intends to use evidence that a conference *is* policing its members, that is, evidence of assessment of damages under its self-policing system, as a basis for civil penalty claims under the Shipping Act. The

---

4. It will not do, in this case, to say that the Commission could disapprove agreements having such provisions and therefore is merely doing all at once what it could do serially. It has, in my view, no authority to disapprove an agreement *unless,* after hearing, it finds inadequate policing or lack of reasonable complaint procedures. That a re-writing of section 15, contrary to express congressional limitation, would facilitate the Commission's activities under section 21 is, I think, irrelevant.

5. 43 Fed.Reg. 42,759 (1978). That the Commission will, under its Final Rules, "afford significant weight" and "credit" for self-policing damages paid, and will forgo further penalties for "isolated, less serious" Shipping Act violations of cooperative carriers who have paid those damages, may reflect a compassionate approach; it does not create authority for the challenged rules.

Commission has authority under section 15, after notice and hearing, to disapprove an agreement if it finds inadequate policing in spite of damage assessments. To use a conference's self-policing actions as a basis for penalties, however, creates a classic "catch 22," in which a conference is doomed by its successes. Rule 528.1(c) is in my view a misuse of the Commission's authority to disapprove conference agreements under section 15. That section was never intended as a mechanism by which the Commission could, under threat of agreement disapproval, achieve collateral enforcement of the Shipping Act.[6]

### C. Legislative History

The legislative history of the 1961 Amendments to the Shipping Act illustrates the limitations on Commission authority residing in the self-policing provisions of section 15.

The House-passed bill, H.R. 6775, included a requirement that "[n]o conference agreement shall be approved unless the Board [Commission] finds that it contains effective provisions for policing the obligations under it." H.R.Rep.No.498, 87th Cong., 1st Sess. 40 (1961). That bill was introduced in the Senate where hearings were conducted, and extensive testimony was received in opposition to the authority to prescribe "effective" provisions.[7]

Subsequently, the Senate Report accompanying the bill said:

We also deleted a provision which would have amended section 15 to require that no conference agreement could be approved unless the Commission found that the agreement contained "effective" provisions for policing the obligations under it. Your committee's amendment would require the Commission to disapprove any conference agreement if it found, after notice and hearing, that as among the members there had been inadequate policing and enforcing of their obligations under the agreement.[8]

As this court said in *Outward Continental North Pacific Freight Conference v. Federal Maritime Commission*, 385 F.2d 981, 984 n.7 (D.C.Cir.1967), Congress objected to the requirement that *effective* provisions be included *before* the agreements could be approved in 1961.[9] There is a clear and essential difference between authority to disapprove agreements for lack of effective provisions and authority to disapprove agreements only upon a finding, "after notice and hearing," that, "as among the members" signatory to the agreement under review, "there had been inadequate policing."

Commission authority to prescribe in advance specific policing systems and procedures was thus considered and rejected during the legislative process. In light of that clear indication of congressional intent, I cannot agree that the Commission may do under guise of its rulemaking powers pre-

**6.** The current rules can be viewed as creating a framework in which neutral bodies act as "litte FMC's," collecting and passing information to the Commission for collateral enforcement purposes. That the challenged rules would ease the Commission's burdens of enforcement of the Act cannot alone, however, confer authority to promulgate those rules.

**7.** Hearings on H.R. 6775 Before the Merchant Marine and Fisheries Subcommittee of the Committee on Commerce, United States Senate, 87th Cong., 1st Sess. 631, 649, 654, 676, 684–86, 712 (1961).

**8.** S.Rep.No.860, 87th Cong., 1st Sess. 17–18 (1961), U.S.Code Cong. & Admin.News 1961, p. 3124.

**9.** Permeating the Commission's position, and the majority opinion, is the notion that Con-

gress' objection was somehow only temporary, *i. e.*, that Congress intended that the Commission merely "try" operating under its statutory authority, and, if that didn't work, the Commission was free to ignore the objection of Congress and go its own way, doing whatever it wished in an effort to achieve the broad congressional goal of effective self-policing. I can nowhere find the slightest evidence, in the legislative history or elsewhere, in support of that notion. Congress did *not* say "Try this and see if it works; if it doesn't, do as you like." If an agency is frustrated by specific congressional limitations on its authority, it should seek congressional removal of those limitations. It should not seek removal by a court, on an argument that Congress really didn't mean what it specifically said.

cisely that which Congress declined to permit it to do within its adjudicatory powers as granted in section 15.

The legislative history relative to rule 528.1(c) is equally fatal to a finding of authority for that rule. The House bill contained a provision requiring carriers to provide records to the Commission upon order. H.R.Rep.No.498, 87th Cong., 1st Sess. 40 (1961). During the Senate hearings there was virtually uniform opposition to that initial requirement, and it was deleted from the version of the bill finally reported to the Senate:

> Your committee deleted from the bill a provision which would have amended section 15, Shipping Act, 1916, to require that all agreements approved under that section ... provide that every such signatory [to the agreement] shall furnish the Commission "records or other information," wherever located in compliance with Commission orders. This provision was so vigorously opposed, and for good reasons, by practically all interested parties except the Federal Maritime Board, that we deleted it.[10]

Rule 528.1(c) would now insure the same Commission access to self-policing records that Congress specifically refused to authorize.

I cannot agree that there is a "contradiction" in comparing: (1) the Senate Committee's deletion of the access to records provision, and (2) the Senate's awareness of two circuit court decisions[11] which had interpreted section 21 of the Shipping Act[12] to allow Commission access to documents located abroad. The Senate specifically referred to the two appellate decisions in its committee report, saying:

> To date two U.S. courts of appeal have held that under the present section 21, Shipping Act, 1916, the Commission may lawfully order foreign flag ocean common carriers serving U.S. ports, inbound or outbound, to furnish documents in compliance with lawful section 21 orders, even though the documents are located in foreign countries. How the United States will be able to enforce such orders in the face of directives not to produce from five friendly maritime nations (Belgium, Italy, Japan, the Netherlands, and the United Kingdom) is a question of great foreign policy importance. Certainly, we would only muddy the waters and do violence to our foreign policy were we to leave such provisions in the bill. Furthermore, we are convinced that if we did so a number of steamship conferences would have to dissolve since a number of foreign lines would be compelled by their governments to withdraw, rather than submit to the receipt-of-process and document-production pledge required by the language of the bill.[13]

Thus, with clear knowledge and understanding of the two circuit court decisions, Congress, as it had a perfect right to do, rejected a requirement that carriers must permit Commission access to self-policing records and documents, *as a condition for section 15 approval.* That same requirement should not now be unlawfully resurrected by promulgation of rule 528.1(c). That would, as would all unlawful conduct of government agencies, diminish severely that public respect which forms the lifeblood of both the legislative and the regulatory processes. Where, as here specifically recognized by the Congress, the requirement would "do violence to our foreign policy," and lead conferences to "dissolve," its approval would constitute an extra blood-letting least affordable by a government necessarily resting on respect of the people.

---

10. S.Rep.No.860, 87th Cong., 1st Sess. 17 (1961), U.S.Code Cong. & Admin.News 1961, p. 3124.

11. *Montship Lines, Ltd. v. Federal Maritime Bd.*, 295 F.2d 147, 153–54 (D.C.Cir.1961); *Kerr Steamship Co. v. United States*, 284 F.2d 61, 63–64 (2d Cir. 1960), *vacated on other grounds,*

369 U.S. 422, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962).

12. 46 U.S.C. § 820 (1976).

13. S.Rep.No.860, 87th Cong., 1st Sess. 25 (1961), U.S.Code Cong. & Admin.News 1961, p. 3132.

## D. *Section 43*

Apparently recognizing an absence of legal foundation for the challenged rules in section 15, the Commission relies heavily on the broad language of section 43 reading "[t]he Commission shall make such rules and regulations as may be necessary to carry out the provisions of this chapter." [14] Reliance on that blanket provision, however, begs the question whether the Commission was statutorily empowered to do what it did here.

Of course the Commission has and should have broad rulemaking authority. The breadth of its rulemaking powers cannot, however, be so great as to enable the Commission to do what Congress specifically objected to its doing.

Moreover, the Commission has not shown how the challenged rules can be said to be "necessary to carry out" any provision of section 15. The language of that section requires a finding of inadequate self-policing, *after notice and hearing*, before an agreement can be disapproved. Thus, if there be a relationship between sections 15 and 43, in the context of the challenged rules, that relationship is one of conflict, not necessity. The Commission, in promulgating the challenged rules, is using section 43 to grant itself a basis for disapproving agreements not only not available to it under section 15 but denied to it in the legislative history of that section. Because the latter section is specific in spelling out the basis on which the Commission may disapprove an agreement, the Commission must be limited to that basis and cannot use a boiler-plate rulemaking section to effectively write into section 15 a new basis for disapproval specifically denied to it by Congress. [15]

Accordingly, I cannot agree that authority inheres in section 43 "coupled with" section 15 to prescribe a plethora of agreement provisions as a pre-condition to approval, or that section 43 has always been available to "implement" section 15 in that manner at the option of the Commission. The Commission may not lawfully proceed under section 43 to prescribe rules which expand its authority under section 15. To hold otherwise is to render Congress unnecessary after passage of the original Act. Where, as here, the rules expand Commission authority into areas specifically prohibited by Congress, the action of promulgating them must be viewed as, at best, arbitrary and capricious.

## III. WAIVER

The Commission points to rule 528.3(b)(3), providing for exemptions from the requirement for an independent self-policing body under certain circumstances,[16] and trumpets

---

14. 46 U.S.C. § 841a (1976).

15. That the Commission faces difficulties in attempting to enforce the Shipping Act, as evidenced by the horror stories of unlawful conduct recited in the majority opinion, is lamentable. The solution to those difficulties may lie with the Congress. It does not lie here. Nor can unlawful actions of the regulated authorize unlawful actions of the regulator.

16. 46 C.F.R. § 528.3(b)(3) (1978) reads as follows:

Upon petition to the Commission, an exemption may be sought to allow officers or employees of a rate-fixing body to act as the head of, or be assigned to duties under, the policing authority, if such person or persons are not otherwise employed by, affiliated with, or have any interest in, any member or any associate of a member. Petitions for exemption will not be lightly granted and must include a convincing showing that:

(i) the persons conducting self-policing activities are qualified and their self-policing activities would not substantially conflict with their other duties and responsibilities;

(ii) the agreement is so limited in scope that the retention of an independent self-policing authority would impose an unrealistic financial burden on the members. The number of members, the financial condition of the members, the nature and extent of the trade, the competitive circumstances prevailing in the trade, and other activities of the members both within and without the trade (*e. g.*, participation in other agreements) are all relevant considerations;

(iii) the trade covered by the agreement has been relatively free of rebating or other conduct violative of the Shipping Act in the five years preceding the year when exemption is sought and is likely to continue to be characterized by a minimal level of such malpractices.

that rule as evidence of its reasonableness in providing a solution to the many problems cited by petitioners as likely to cause the demise of the entire conference scheme. However that may be, a provision for possible waiver of unauthorized rules can hardly be said to create the missing congressional authority for those rules. If, as I believe, the Commission lacked authority to promulgate the challenged rules, its provision for waiver is simply irrelevant.

## IV. PRECEDENT

Former general order 7, predecessor to the challenged rules, was at issue in *Outward Continental North Pacific Freight Conference v. Federal Maritime Commission*, 385 F.2d 981 (D.C.Cir.1967). Promulgated pursuant to section 43, general order 7 provided that: (1) each conference agreement must include a provision describing the policing system used by Conference members, and (2) the conference must file with the Commission semi-annual reports describing the nature and disposition of all complaints received. Holding that the Commission had not exceeded its rulemaking authority under § 43, this court said:

> [W]e think it a reasonable interpretation of the Congressional insistence upon adequate policing that the conference be able to point to some systematic and regular procedures for securing its members' adherence to the obligations of the agreement. Nor do we think the Commission exceeds its bounds in requiring that these procedures be described in a provision of the agreement. Compulsory amendment of the agreement is a reasonable manner of ensuring that the conference has in fact adopted a policing system and that it is brought clearly to the Commission's attention.[17]

The court further concluded that "[t]he Commission can reasonably 'find,' without the necessity of an extended evidentiary hearing, that any conference which refuses to adopt and communicate to the Commission an outline of its policing method does not adequately police its members."[18]

Whatever may be said of the authority found present in *Outward Continental*, the rules here challenged differ substantially from General Order 7. It is one thing to require at the threshold that conferences describe some policing system. It is quite another to prescribe all the effective provisions which must be included before agreements can be approved. *See Outward Continental*, 385 F.2d at 984 n.7. An agreement containing no description of a self-policing system might be said to raise at least an inference that a conference is employing none. The same inference is not raised, however, by an agreement that does describe a policing system, albeit a system differing in some respect from that designed by the Commission and specified in the challenged rules. Approval of the rules here challenged would in my view rest on an unwarranted extension of what was said and done in *Outward Continental*.

## V. CONCLUSION

I would set aside 46 C.F.R. § 528 (1978) as an invalid and unlawful exercise of the Commission's authority.

---

17. *Outward Continental N. Pac. Freight Conference v. Federal Maritime Comm'n*, 385 F.2d at 984 (footnote omitted).

18. *Id.* at 984–85 (footnotes omitted). Whatever may have been meant by "an extended evidentiary hearing," I read this statement as affirming the adjudicatory role of the Commission under section 15.